## SHEARER v. FARMERS' LIFE INS. CO.

### WIBLE v. SAME.

(Circuit Court of Appeals, Eighth Circuit. December 2, 1919.)

### Nos. 5372, 5373.

1. CONTRACTS ⊚⇒264—EQUITY GRANTS RESCISSION AS RESTORATION TO INJURED PARTY, BUT REQUIRES HIM TO DO EQUITY.

Equity grants rescission of a contract obtained by fraud as a means of restoring the parties to their original situation, but will not permit it to be made a means of injustice, and will require the defrauded party to do equity to the other.

2. INSURANCE ⊚⇒33—BUYER OF STOCK OF CORPORATION WHOSE VALUE IT HAD DESTROYED MUST PAY ACTUAL VALUE TO OBTAIN RESCISSION.

Where an insurance company was induced by fraud to purchase stock of another company, and had destroyed the value of the stock by transferring the assets and business of the latter company to itself, equity, on granting rescission, will require the buyer to pay the actual value of the stock at the time of its purchase.

3. APPEAL AND ERROR ⊚⇒931(1)—PRESUMPTION IS THAT FINDINGS AND CONCLUSIONS OF TRIAL COURT ARE CORRECT.

The presumption is that the findings and conclusions of the trial court were right, and they will not be disturbed on appeal, unless the record shows a material mistake of fact or serious error of law.

4. INSURANCE ⊚⇒33—WHERE AGENTS OF INSURANCE COMPANY BUYING STOCK OF ANOTHER KNEW OF FACTS AFFECTING ITS VALUE, BUYER CANNOT CLAIM MISREPRESENTATION.

Where the agents of an insurance company, who purchased stock of another company, knew of a report by an insurance commissioner discounting the value of certain securities owned by the latter company, the buying company had sufficient notice to put it on inquiry, and cannot rely on misrepresentations as to the value of those assets.

5. INSURANCE ⊚⇒33—PROOF OF MATERIAL MISREPRESENTATION OF VALUE OF ASSETS OF INSURANCE COMPANY HELD TO WARRANT RESCISSION OF STOCK PURCHASE.

Where the evidence showed that an insurance company, whose stock plaintiff purchased, listed among its assets many notes and mortgages given to it without valuable consideration to enable it to deposit with the insurance department the required amount of securities, and that the security of some of them was insufficient, of which facts the purchaser had no notice, there was sufficient evidence of intentional misrepresentation to sustain a decree of rescission.

6. CORPORATIONS ⊚⇒487(1)—EQUITY WILL DECREE RESCISSION OF ULTRA VIRES CONTRACT ONLY IF CORPORATION DOES EQUITY.

A corporation which has made an ultra vires contract can obtain a rescission thereof in equity only on condition of doing equity to the other party, which necessitates restoration of consideration.

7. APPEAL AND ERROR ⊚⇒1054(1)—ERRONEOUS ADMISSION OF EVIDENCE NOT FATAL, IF THERE IS SUFFICIENT COMPETENT EVIDENCE TO SUPPORT DECREE.

The erroneous admission of evidence in an equitable suit for a rescission of a contract does not invalidate the decree, if there was sufficient

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

con-petent and relevant evidence to sustain the charge of material. misrepresentations inducing the contract.

**8. INSURANCE ☞33—ESTOPPEL OF INSURANCE COMPANY TO RESCIND PURCHASE OF STOCK.**

An insurance company, which purchased stock of another company and transferred the business and assets of the latter company to itself, is not estopped to rescind its contract for the purchase·of the stock for fraud, where the evidence did not show that it had knowledge of the fraud before it transferred the assets and business to itself.

**9. INSURANCE ☞33—RIGHT TO SHARE IN REMAINING ASSETS HELD NOT TO ESTABLISH EQUITY OF RESCISSION ON SURRENDER OF STOCK.**

Where an insurance company had purchased stock in another, induced by fraud, and had transferred to itself the assets and business of the latter, except the assets deposited with the state insurance department, the right to participate in the deposited assets does not render equitable a rescission on reconveyance of the stock, since the value of the stock represented by the other assets of the company and its outstanding business cannot be restored.

**10. CORPORATIONS ☞537—INSUFFICIENCY OF ASSETS OF INSURANCE COMPANY TO EQUAL PAR VALUE OF STOCK DOES NOT ESTABLISH INSOLVENCY.**

An insurance company, whose assets exceeded its liabilities, and which was able to pay those debts as they matured, is not insolvent, though tne excess of its assets over its liabilities was less than the· par value of its outstanding stock.

Appeals from the District Court of the United States for the Western District of Missouri; Joseph W. Woodrough, Judge.

Separate suits by the Farmers' Life Insurance Company against W. F. Shearer and against John Wible. Decrees for complainant, and defendants appeal. Reversed, with instructions to render modified decrees for complainant.

J. Herbert Smith and William G. Holt, both of Kansas City, Mo. (James K. Cubbison and Amos Townsend, both of Kansas City, Mo., on the brief), for appellants.

W. F. Zumbrunn, of Kansas City, Mo. (H. A. Hicks, of Denver, Colo., on the brief), for appellee.

Before SANBORN, Circuit Judge, and MUNGER and YOU-MANS, District Judges.

SANBORN, Circuit Judge. These are appeals from decrees of rescission of contracts between the appellants and the appellee, by means of which the appellee, the Farmers' Life Insurance Company, secured and retains all the assets of the Anchor Life Insurance Company, in which the appellants Shearer and Wible, were the controlling stockholders when the contracts were made. A brief statement of the situation of the parties when the contracts were made and at this time since the decrees, and a history of their transactions, is necessary to an understanding of the questions at issue.

In September, 1914, the Anchor Life Insurance Company, a corporation of the state of Kansas, was conducting its insurance business in Kansas City. It had issued its policies to the amount of about $1,600,-000, and the annual premiums payable thereon were about $49,000. Under the statutes of Kansas this company was required to maintain

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

a deposit of securities with the officers of that state to the amount of $100,000, the par value of its 1,000 shares of capital stock, in order to secure permission to conduct its business in that state, and to the amount of about $25,000 more to maintain a legal reserve to secure the payment of its policies. Its insurance had so increased that it was difficult for it to maintain the required deposits, and Mr. Jones, an examiner for the insurance department of Kansas, after examining the securities of the company, had filed a report in the insurance department to the effect that there should be deducted from the value of its assets, which were $160,814.06, as shown by its report of December 31, 1913, $30,000 on account of two mortgages, aggregating $30,000, made by one Wade, $9,000 on account of eight mortgages, for $1,250 each, and $29,500, the value stated in that report of $41,000, face value, of the bonds of the Williamsville, Greenville & St. Louis Railway Company, making in all a deduction of $68,500, leaving the value of the company's assets $92,314.06, and showing an impairment of its capital to the extent of $34,554.94, according to the report of Jones. Shortly after the filing of this report, the superintendent of insurance notified the company that it must deposit securities sufficient to remove this impairment, or he would be compelled to apply for a receiver of its property at the end of 30 days.

In September, 1914, the Farmers' Life Insurance Company, a corporation of the state of Colorado, was conducting a life insurance business at Denver in that state. Its capital stock was $1,000,000, divided into shares of the par value of $3 each. The aggregate amount of the insurance it had written was about $850,000, or about one-half of that which had been written by the Anchor Company. The evidence tends to show that it is necessary for a life insurance company to have about $5,000,000 of insurance to enable it to maintain its required deposits, pay its expenses, and conduct a profitable business from its income; and, as the addition to insurance which a company has itself written of insurance already written by other companies does not materially increase its overhead expenses, and increases its insurance much faster than to solicit and to write it, the Farmers' Insurance Company was endeavoring to buy such insurance of other companies, by purchasing them or their property and reinsuring their risks. Mr. Royce was the superintendent of its agents. He had been bank examiner of the state of Kansas, was well acquainted with Mr. Lewis, the superintendent of insurance of Kansas, had secured the admission of the Farmers' Company into that state, and was well qualified to examine, ascertain, and state the value of the assets of insurance companies. He, Mr. Temple, the secretary or attorney of the Farmers' Company, and Mr. O'Shaughnessy, one of its agents, went from Denver to Kansas City in September, 1914, to secure the insurance and other property of the Anchor Company for the Farmers' Company. Before they went, some of them had seen a copy of the report of the Anchor Company of December 31, 1913, and before any contract was made by them, or the Farmers' Company, some of them had notice of the contents of Mr. Jones' report, of the worthlessness of the Wade mortgages, for $30,000, and of the railroad bonds,

for $41,000, par value, and of the fact that notice had been given to the Anchor Company that an application for a receiver of its property would be made shortly, unless it speedily deposited securities to remove the reported impairment of its capital. They endeavored to acquire the insurance and assets of the Anchor Company, by arranging an exchange of the stock of the Farmers' Company for that of the Anchor Company at the rate of 15 shares of the former for one share of the latter. Mr. William F. Shearer owned 135 shares and was the president of the Anchor Company. Mr. John A. Wible owned 351 shares of that company's stock and was its secretary. They controlled the insurance, the property, and the business of the Anchor Company.

The agents of the Farmers' Company conferred and negotiated with them from some time in September until November 16, 1914, to obtain their stock for the Farmers' Company and their assistance in getting the other stock of the Anchor Company for it, to the end that that company might have the Anchor Company and all its insurance, income, and assets. The result of these negotiations was that between November 13 and November 17, 1914, the Farmers' Company made contracts with Shearer to pay him for his 135 shares of Anchor stock $27,000, $13,500 in 1,350 shares of the stock of the Farmers' Company and $13,500 in notes which that company had received for the sale of its stock; that the Farmers' Company did and would pledge 1,350 shares of its stock and the 135 shares of stock of the Anchor Company bought by it of Shearer as collateral security for the payment of the stock notes; and that the stock and the stock notes secured thereby should be and they were delivered to Townsend and Smith in trust to secure the performance of these agreements. The Farmers' Company at the same time made agreements with Mr. Wible to pay him for his 351 shares of Anchor stock $62,500, $5,000 in cash, $17,500 in three mortgage notes, for $3,500, $6,000, and $8,000, respectively, which notes were secured on Wible's property and were owned by the Anchor Company, and $40,000 in stock notes owned by the Farmers' Company and made by the purchasers of its stock; that the Farmers' Company would and did pledge 4,000 shares of its stock and the 351 shares of the stock of the Anchor Company bought by it of Wible as collateral security for the payment of the $40,000 of stock notes; and that the stock so pledged and the notes so secured should be and they were delivered to Townsend and Smith in trust to secure the performance of these contracts. The stock pledged by these contracts, the notes secured thereby, and their proceeds were prior to the decrees placed in the custody of the court below and constitute a part of the subject of this litigation. These contracts gave the Farmers' Company unrestricted control and possession of the insurance and other assets of the Anchor Company.

At the time these contracts were made the Farmers' Company hired Shearer and paid him $2,500 to assist it in exchanging its stock with other holders of Anchor stock at the rate of 15 for 1, in getting the Anchor Company insurance over to the Farmers' Company, and inducing the Anchor Company's policy holders to reinsure in the Farmers' Company, and in acquiring all the other assets of the Anchor Company.

All this was practically accomplished by the early part of January, 1915. The Farmers' Company acquired, including the stock of Shearer and Wible, more than 95 per cent. of all the stock of the Anchor Company, by the use of this stock caused the substitution of its agents, Royce, O'Shaughnessy, and others for Wible, Shearer, and the other officers and directors of the Anchor Company, and made a contract of reinsurance of the Anchor Company's policy holders which the great majority of them accepted, while those that did not accept generally abandoned their policies, so that all the value of the property of the Anchor Company was secured and appropriated to its own use by the Farmers' Company.

On January 15, 1915, after all this had been done, the Farmers' Company gave notice to Shearer and Wible that, on account of their misrepresentations of the value of the assets of the Anchor Company during the negotiations for the contracts, it elected to rescind its contracts with them and offered to return the shares of Anchor stock it had secured from them and other stockholders, to abrogate its contract of reinsurance of the Anchor Company's policy holders made on December 11, 1914, and to return everything of value it had received, upon the return to it of the consideration it paid therefor. In March, 1915, it brought these suits, one against Shearer and the other against Wible, for rescission of the contracts on the grounds: (1) That 50 shares of Shearer's 135 shares were an overissue; (2) that Shearer and Wible represented the value of the assets of the Anchor Company to be much greater than it actually was, especially the value of some of its mortgage securities, and of the $41,000, face value, reported worth $29,500, of the bonds of the Williamsville Railway Company, and that the contracts were beyond the powers of the Farmers' Company. It prayed that all the contracts be avoided, and that the defendants Shearer and Wible and the trustees be decreed to deliver and pay over to it all they had received under the contracts, except the 135 shares of Anchor stock delivered to it by Shearer and the 351 shares delivered to it by Wible, and that they have such other orders and decrees as might seem meet.

The defendants answered. In their answers they denied the equities of the complaints, alleged that the Farmers' Company had investigated and had notice of the character and value of the assets of the Anchor Company before it made its contracts, alleged that the Farmers' Company had failed to perform them, that it had failed to return any of the property it received under them, that it was unable to return the property of value which it had received thereunder, and prayed for specific and general affirmative equitable relief.

The court below rendered decrees in favor of the Farmers' Company. At the time of the entry of the decree in the suit against Shearer, there were in the custody of the court in his case stock notes unpaid of the face value of $3,375, $10,367.37, the proceeds of such notes paid, 1,350 shares of stock of the Farmers' Company, and 135 shares of stock of the Anchor Company. The court adjudged that this cash, these notes, and the 1,350 shares of the stock of the Farmers' Company be delivered to the Farmers' Company, that the defendant

Shearer pay the costs of the suit and have nothing but the 135 shares of stock of the Anchor Company, from which the complainant had extracted and appropriated to itself everything of value. At the time of the entry of the decree against Wible, there were in the custody of the court in that case stock notes unpaid of the face value of $17,872.50 and $24,483.42 in cash, the 4,000 shares of stock of the Farmers' Company, and the 351 shares of stock of the Anchor Company. The court decreed that these notes and this cash and the 4,000 shares of stock of the Farmers' Company be delivered to it, that Wible reassign to it the $8,000 note and mortgage which had been assigned to him pursuant to the provisions of the contracts between him and the Farmers' Company, that the Farmers' Company recover $5,975 from him, that if he should fail to make such reassignment, or to pay the $5,975, the 351 shares of stock of the Anchor Company should be sold, and its proceeds should be applied to pay the judgment against Wible and the costs of the suit, and that execution issue against him to enforce the decree. It is from these decrees that Shearer and Wible have appealed.

[1] The basic reason for the rescission of a contract by a court of equity is that, where it has been obtained by fraud, deceit, or other unlawful act of one of the parties, their restoration as near as may be to their respective situations before the contract was made generally gives the most equitable relief to the injured party at the expense of the least loss to the perpetrator of the wrong. The grant of such relief is and always ought to be conditioned by the application to its terms and to the measure of its extent of the equitable principles that he who seeks equity must do equity, that a court of chancery may and it should condition its grant of relief to the complainant whenever possible with the preservation and enforcement of the equities of the defendant, that it may, in a case in which the rules and principles of equity demand it, condition the grant of relief sought from it by the complainant with the enforcement of a claim or equity held by a defendant, which the defendant could not enforce in any other way, Farmers' Loan & Trust Co. v. Denver L. & G. Co., 126 Fed. 46, 51, 60 C. C. A. 588, 593; Burnes et al. v. Burnes et al., 137 Fed. 781, 791, 70 C. C. A. 357, 367; and that a court of equity may and should so mold its decrees as to do equity and avoid inequity, Jones v. Missouri-Edison Electric Co., 144 Fed. 765, 766, 777, 778, 779, 781, 75 C. C. A. 631, 632, 643, 644, 645, 647; Central Improvement Co. v. Cambria Steel Co., 201 Fed. 811, 812, 824, 827, 120 C. C. A. 121, 122, 134, 135, 136, 137; Union Central Life Ins. Co. v. Drake, 214 Fed. 536, 538, 548, 131 C. C. A. 82, 84, 94; United States v. Debell, 227 Fed. 775, 779, 142 C. C. A. 299, 303.

[2] The facts disclosed by the pleadings and the decrees, that the Farmers' Company and the appellants made the contracts rescinded on the agreed basis that the property of the Anchor Company was worth $184,731, and the stock of the appellants therein $89,700, the fact that it is not claimed that the property or stock of the Anchor Company was worthless, or that the Farmers' Company received no substantial value or benefit therefrom, but the complainant only urges

that they were worth much less than the agreed estimate; and the fact that Shearer and Wible will come out of these transactions under the decrees below, when executed, without anything of value, while the Farmers' Company will have retained all it had before the contracts were made, and will have added thereto and retained all the value that the Anchor Company and the appellants as its stockholders had, without paying or being required to pay anything therefor—have brought these principles of equity jurisprudence forcibly to mind, have suggested the questions: What was the real value of the property of the Anchor Company and of the stock of Shearer and Wible when the contracts were made? May not decrees be lawfully made which will relieve the Farmers' Company of their contracts to pay more than the value of the appellants' stock, and yet avoid depriving the appellants of all its value? and have induced a patient examination of the evidence in an endeavor to find a fair value of the property of the Anchor Company and of the stock of the appellants at the time the contracts were made.

There is testimony scattered through the more than 600 closely printed pages of the records of the trials of these cases relating to the value of about 60 separate securities claimed to have been the property of the Anchor Company at some time. The evidence relative to each one of these securities has been extracted, collected together, considered, and a conclusion has been deduced therefrom as to the ownership of that security by the Anchor Company and as to the value of it on November 15, 1914. The first contracts were made November 14, 1914, and the second contracts on November 16, 1914. As to some of these securities the proof on these questions is not clear or conclusive, but an appeal in equity invokes a trial of the case de novo, and the Supreme Court has admonished that, although the proof in a suit in equity be uncertain and its effect doubtful, it is still the duty of a court of equity to decide the issues presented on the evidence furnished to it, in accordance with the best judgment it can form thereon. This has been done as to each of these securities. Time and space will not permit the review or statement of the details of the evidence regarding them. Suffice it to say that the Williamsville Railway bonds, reported at $29,500, and the Wade mortgages, reported at $30,000, according to the report of December 31, 1913, and the so-called donation notes and mortgages, for which the Anchor Company gave no valuable consideration, but which it deposited with the state officers to comply with their requirements, have been found worthless on November 15, 1914. The three mortgage notes—for $3,500, secured on Wible's property at 1832 Washington street, Kansas City, Mo.; for $6,000, secured on his property at Twenty-Fifth and Washington streets, Kansas City, Mo.; for $8,000, secured on his property at 1221 Garfield avenue, Kansas City, Mo.—which Wible and the Farmers' Company agreed that he should take in part payment of the $62,-500 it agreed to pay him for his Anchor stock, have in view of that fact, and of the other evidence regarding them, been found to have been worth on November 15, 1914, respectively, $4,285, $6,270, and $8,-000 aggregating $18,555.83, and this amount has been deducted from

the determined value of his 351 shares of stock on that date in ascertaining the amount which he ought in equity to receive in addition to these mortgage notes and their securities.

. The result of the consideration in the way which has been described of all the evidence regarding each of the mortgages, securities, and bonds claimed to have been owned by the Anchor Company on November 15, 1914, is that those owned by it on that date were worth $85,-716.25, that its written insurance was worth $19,000, that it owned cash items in addition to the above amounting to $4,000, that the real value of its property was $108,716.25, that the value of the 135 shares of its stock owned by Shearer was $14,676.69, and that the value of the 351 shares thereof owned by Wible was $38,159.40.

There is testimony tending to show that the Farmers' Company paid Wible $5,000 in cash in part payment for his stock, and that he paid to the trustees holding the securities $2,000 thereof. The difference, $3,-000, and the value on November 15, 1914, of the three mortgage notes Wible was to take in part payment for his stock, $18,555.83, have been deducted from the value of that stock, $38,159.40, and the conclusion is that the balance, $16,603.57, and the three mortgage notes and their securities, were on November 15, 1914, equal to the real value of Wible's stock in the Anchor Company on that day. In view of these findings and conclusions, the effect of the decree in Shearer's case will be to restore to the Farmers' Company the 1,350 shares of its stock, the stock notes, and the proceeds thereof, and to settle and confirm in it the title to $135/1000$ of all the assets of the Anchor Company, which was worth $14,676.14 on November 15, 1914, without the receipt by him of anything of value therefor, for his 135 shares of Anchor stock were rendered worthless by the transfer of all the property of that company to the Farmers' Company before suit was brought against him; and the effect of the execution of the decree in Wible's case will be to restore to the Farmers' Company the 4,000 shares of its stock, the stock notes delivered to the trustees, and the proceeds thereof, to deprive Wible of the entire value of his stock, which was $38,159.40 on November 15, 1914, and to vest the title of the property it represented irrevocably in the Farmers' Company, without his receipt of any substantial consideration therefor.

These decrees cannot be sustained. They conflict with the principles of equity jurisprudence, that he who seeks equity should do equity, and that a court of equity should so mold its decree, if possible, as to avoid inequity as well as to do equity. These decrees unnecessarily inflict upon Shearer and Wible an injustice and inequity not less flagrant than that from which they relieve the Farmers' Company. What, then, ought a court of equity to do? It ought as nearly as possible to do equity. Its province is not the infliction of punishment. It is to hold the scales even, and to grant to all alike their just dues. To such a court the Farmers' Company has elected to appeal for relief, and not to a court of law for its damages, as it might have done; and such a court ought to render such decrees as will justly adjudge and settle all the equities of each of the parties to this litigation. ·

The decrees below should be reversed. A decree should be render-

ed in Shearer's case to the effect: (1) That the contracts between him and the Farmers' Company be set aside; that the proceeds of its stock notes be paid over to it; that its unpaid stock notes and its 1,350 shares of stock pledged to secure their payment, and the 135 shares of the stock of the Anchor Company, which are worthless, be conveyed and delivered to it; that all this be decreed and done on condition, but not otherwise, and on no other condition, that within 60 days, or such other short time as shall be allowed by the District Court, after the entry of the decree, the Farmers' Company pay to Shearer $14,676.14, the value of his stock on November 15, 1914, and interest thereon at 6 per cent. per annum from that date to the date of such payment; that in case such payment is made within the time prescribed the Farmers' Company have the relief which it is above declared entitled to, on the condition there stated, and recover of Shearer the cost of its suit. (2) That in case the Farmers' Company fails to make such payment within the time fixed in the decree, all the proceeds of the stock notes in his case be forthwith paid over to Shearer, in part payment of the $14,676.14 and interest to the time of payment; that the 1,350 shares of the stock of the Farmers' Company pledged to secure the payment of the stock notes in his case be sold under the direction of the court; that the proceeds of such sale be applied, first, to the payment of the costs of the suit, and, second, to the payment of the unpaid remainder of the $14,676.14 and interest; that the surplus, if any, of such proceeds of the sale after such payments are made, be paid over to the Farmers' Company; and that, in case there still remains a part of the $14,676.14 and interest unpaid, Shearer recover the amount of such deficiency of the Farmers' Company and have execution to collect it.

In Wible's case the agreement was that he should take, in part payment of the $62,500 agreed to be paid for his stock, $5,000 in cash and at their face value three mortgage notes, for $3,500, $6,000, and $8,000, respectively, owned by the Anchor Company and secured by mortgages on three different tracts, respectively, of Wible's real estate. The note for $3,500, which was secured on his property at 1832 Washington street, Kansas City, Mo., and was worth $4,285, on November 15, 1914, was delivered to Wible on November 16, 1914. The mortgage was foreclosed, the mortgaged property was bid in at the foreclosure sale by Shearer for Wible, the time for redemption expired without any redemption, the trustee who made the sale duly conveyed the property to Shearer, but the Farmers' Company by claim and notice to Shearer prevented him from conveying it to Wible, and he has never made such a conveyance. The Farmers' Company refused to deliver to Wible the mortgage note for $6,000, secured on his property at Twenty-Fifth and Washington streets, Kansas City, Mo., which was worth $6,270.83 on November 15, 1914. The Farmers' Company delivered to Wible the mortgage note for $8,000, secured on his property at 1221 Garfield avenue, Kansas City, Mo., which was worth $8,000 on November 15, 1914. The Farmers' Company paid Wible $5,000 in cash on November 16, 1914, and Wible paid $2,000 to the receiver in his case,

so that the Farmers' Company is entitled to credit for $3,000, on account of these cash transactions.

A decree should be rendered in Wible's case to the effect that the contracts between him and the Farmers' Company be set aside; that the proceeds of the stock notes in his case be paid over to it; that its unpaid stock notes, and its 4,000 shares of stock pledged to secure the payment of the stock notes in Wible's case, be conveyed and delivered back to it; that the title to the property at 1832 Washington street, Kansas City, Mo., acquired from the foreclosure of the mortgage for $3,500 be conveyed to and vested in the Farmers' Company; that the title to the mortgage note for $8,000 to any amounts collected from it and any rights pertaining to or derived from the ownership thereof be conveyed to and vested in the Farmers' Company and that the 351 shares of Anchor stock be surrendered and delivered to it; that all these things be decreed and done on condition, but not otherwise, and on no other condition, that within 60 days, or such other short time as may be fixed by the District Court, the Farmers' Company pay to Wible $35,159.40, which was the value of his stock, $38,159.40, less the $3,000 cash credit specified above, and interest on said $35,159.40 at 6 per cent. per annum from November 15, 1914, to the day of such payment; that in case such payment is made within the time prescribed the Farmers' Company have the relief it is above declared to be entitled to on the condition there stated, and that it recover the costs of this suit; that in case the Farmers' Company fails to make such payment within the time fixed by the decree: (a) Then that the right and title to and the possession of the $8,000 mortgage note, the mortgage or trust deed securing its payment, and all the proceeds and property derived and derivable therefrom be decreed to be quieted in Wible; (b) that the Farmers' Company cause the $6,000 mortgage note, the mortgage or trust deed securing it, and all the proceeds and property derived or derivable therefrom, to be conveyed to and vested in Wible, and that the title thereto be quieted in him; (c) that the Farmers' Company convey, assign, and release to Wible all its right and claim to the mortgage note for $3,500, the mortgage or trust deed securing the payment thereof, and all the proceeds and property derived or derivable therefrom, that it cause Shearer to convey to Wible the property mortgaged or conveyed by the trust deed to secure that note, and that the title to that property and to the note and mortgage relating thereto be quieted in Wible; (d) that in case the provisions of paragraph (a) above are performed and become effectual within 120 days after the entry of the decree, or such other short time as may be fixed by the District Court as to the $8,000 mortgage note, the security therefor, and the proceeds and the property derived and derivable therefrom, then the sum of $8,000 shall be deducted from the $35,159.40 above mentioned as of the date of November 15, 1914; that in case the provisions of paragraph (b) above are performed and become effectual within 120 days after the entry of the decree, or such other short time as may be fixed by the District Court, as to the $6,000 mortgage note, the security therefor, and the proceeds and property derived and derivable therefrom, then $6,270.83 more shall be deducted from that

$35,159.40 as of November 15, 1914, and in case the provisions of paragraph (c) above are performed and become effectual within 120 days after the entry of the decree, or such other short time as may be fixed by the District Court, as to the $3,500 mortgage note, the security therefor, and the property derived and derivable therefrom, and especially as to the title of the property derived from the foreclosure of the trust deed securing that note, which title is now in Shearer, then $4,285 more shall be deducted from the $35,159.40 as of the date of November 15, 1914; that all the proceeds derived from the stock notes in Wible's case, or such part thereof as may be required to pay in full the costs of this suit and the $35,159.40 and interest thereon at 6 per cent. per annum from November 15, 1914, to the time of payment, or, in case any reduction or reductions therefrom are made pursuant to the last preceding paragraphs relating to such reductions, then to pay the remainder of said $35,159.40 after such reductions are made, and the interest on such remainder from November 15, 1914, to the day of its payment, be paid over to Wible and applied, first, to the payment of the costs of the suit, and, second, to the payment of $35,159.40 and interest, or, in case such reductions are made, to the payment of the unpaid remainder thereof and the interest thereon; that, after such payment has been made, the unpaid stock notes, the 4,000 shares of stock of the Farmers' Company, and the 351 shares of the stock of the Anchor Company be sold under the direction of the court, and the proceeds thereof be applied to the payment of the unpaid remainder of the $35,159.40 and the interest thereon, and the remainder of such proceeds, if any, be paid to the Farmers' Company; that in case the $35,159.40 and interest, or any part thereof, still remains unpaid, then that Wible recover the amount of such balance unpaid of the Farmers' Company and have execution against that company to collect it.

What has been said regarding the decrees that should be rendered in these cases is not intended to, nor does it, limit the power or discretion of the court below to vary the decrees and orders to be rendered after the filing of this opinion, from those indicated above, so far as such variations relate to the times, forms, and terms to be used in attaining the indicated result. It has been said to disclose the result desired and the general character of the decrees by which it is thought that result may be reached in accordance with the rules and principles of equity jurisprudence.

[3] The view of the chief contentions of counsel for the respective parties which has led to the conclusions which have been stated is this: The record contains no finding of facts and no opinion of the court below, so that there is nothing but the decrees it rendered to indicate its findings of fact or its conclusions of law. The legal presumption is that its findings and conclusions were right, and they ought not to be disturbed by an appellate court, unless the record proves that the District Court made a material mistake of fact or committed a serious error of law. The evidence fails to satisfy that there was an overissue of 60½ shares of the stock of the Anchor Company, and that this 60½ shares was a part of Shearer's 135 shares, as alleged by the

Farmers' Company, the decree is not appropriate to such a finding, and the conclusion is that the District Court did not so find, and that it ought not to have so found.

[4] The decrees convince that the court below found that Shearer and Wible by their acts and words made material false representations to O'Shaughnessy, Royce, and Temple, or to one or more of them, during the negotiations for the purchase from Shearer and Wible of the property and stock of the Anchor Company, as to the value of the mortgage notes of the Anchor Company and the securities for the payment thereof, and that these misrepresentations induced the Farmers' Company to make the contracts challenged. A careful reading, analysis, and study of the evidence has failed to convince that there was any mistake in this finding of fact. On the other hand, the evidence establishes the facts that O'Shaughnessy, Royce, and Temple were the agents of the Farmers' Company throughout the negotiations for and the making of the contracts, that the notice to and knowledge of each of them of the financial condition of the Anchor Company and of its securities was under the law notice to and the knowledge of the Farmers' Company, that they or one or more of them and that company had such notice before the contracts were made of the Jones report and of the worthlessness of the bonds of the Williamsville Railway Company, and of the Wade mortgages, as would have led a person of ordinary prudence in their situation to full knowledge thereof; that notwithstanding this notice, and their knowledge of the impairment of the capital of the Anchor Company and the receivership that threatened it, these agents and the Farmers' Company urged Shearer and Wible with importunity to make the contracts, which the latter never solicited.

[5] But neither the Farmers' Company nor its agents had adequate notice of the fact that there were many thousands of dollars of notes and mortgages among those which Shearer and Wible by their acts and words during the negotiations held out as good security of the Anchor Company, so far as they knew, which they knew had been given to the Anchor Company without any valuable consideration received by the makers, and merely to enable that company to deposit them with the insurance department of Kansas, and thereby make a showing of an amount of security owned by it sufficient to meet the requirements of the laws of that state. Nor did the Farmers' Company have adequate notice of the insufficiency of the security of some of the mortgage notes so held out. There was therefore sufficient evidence of intentional misrepresentation of the character and value of some of the mortgage securities to have sustained decrees of rescission of the contracts, if Shearer and Wible could have been substantially restored to their respective financial situations before the contracts were made.

[6] Counsel for the Farmers' Company insist that the contracts were ultra vires of the Farmers' Company, and seek their rescission on that ground. Conceding, but neither admitting nor deciding, that the contracts were beyond the powers of that company, it certainly has the power to ask, and is now asking, this court for the same

equitable relief it prays on account of the misrepresentations. The right to this relief in equity on account of its lack of power to make the contracts is conditioned, however, by the same duty on its part to do, and on the part of the court to require it to do, equity as is its right to relief·on the ground of false representations. It is therefore unnecessary to discuss or decide the question whether or not the contracts were beyond its powers. It is not irrelevant to note, however, that, if they were, the Farmers' Company is not without fault. The primary duty rested upon it to know its powers, and not to exceed them, and its taking of all the value of the stock of Shearer and Wible in the Anchor Company without the lawful power to do so, and its persistent attempt to hold it by decrees in equity because it had no such power, does not appeal to the conscience of a chancellor with compelling force.

[7] Counsel for Shearer and Wible complain of the admission in evidence of the report .of the Anchor Company of December 31, 1913. Conceding that its admission was erroneous, and that there was much other evidence erroneously admitted, an examination of the record nevertheless discloses the fact that there was sufficient competent and relevant evidence in this case to sustain the charge of the material inducing misrepresentations to which reference has been made, and the findings and conclusions of this court in this regard rest upon the latter evidence.

[8] Counsel for Shearer and Wible argue that the Farmers' Company should be denied any relief because it was guilty of laches, because it waived its right to rescind, and because it is estopped from rescinding. These defenses are of the same nature, and rest in reality upon the single ground of estoppel. The facts invoked to sustain this estoppel are that the contracts were made between November 13 and November 16, 1914; that about November 16, 1914, Shearer's 135 shares and Wible's 351 shares in the Anchor Company were surrendered to the Farmers' Company, transferred on the books of the Anchor Company and certificates issued to O'Shaughnessy and Royce, the agents of the Farmers' Company, who thereafter held and voted them for that company; that Shearer and . Wible resigned, and O'Shaughnessy and Royce were elected president and secretary of the Anchor Company; that the latter's board of directors passed under the exclusive control of the Farmers' Company, as did the possession and management of all its property and business; that on December 11, 1914, it made a sale of its insurance policies, premiums due and to become due thereon, and of all its securities then held by the superintendent of insurance or the state treasurer of Kansas for the legal reserve only upon its policies of insurance and such of its additional assets as should be necessary to make up the full legal reserves upon all said policies, except the mortgage securities made by E. J. Lutz; that the Farmers' Company assumed and agreed to reinsure all its policies; that the Anchor Company's board of directors adopted a resolution to the effect that the best interests of the stockholders of the Anchor Company required that it be dissolved, that it discontinue its business, and that its president and secretary should make applica-

tion to the superintendent of insurance for permission so to do; that at the annual meeting of its stockholders, which commenced on January 5, 1915, and was adjourned to February 4, 1915, resolutions were unanimously passed, for which the stock formerly owned by Shearer and Wible was voted by its holders, the agents of the Farmers' Company, to the effect that the contract of sale and reinsurance of December 11, 1914, be ratified and approved, that the company should liquidate its affairs, that its board of directors should take such action as should be necessary so to do, and that it should apply to the superintendent of insurance for a delivery to it of the securities held by him over and above the legal reserve; and that the Farmers' Company first gave notice of its intention to rescind the contracts with Shearer and Wible on January 15, 1915, and commenced its suits on March 29, 1915. These facts, it must be admitted, strongly show the disposition on the part of the Farmers' Company to hold, and use for its own benefit, all the property of the Anchor Company, and establish a persuasive equity in the latter's favor. But the evidence in the record fails to prove when the Farmers' Company first received notice of the false representations of Shearer and Wible relative to the donation notes and mortgages, and relative to the inadequacy of some of the other securities, and a careful review of the entire evidence has failed to convince that the Farmers' Company was barred from all relief in a court of equity by either laches, waiver, or estoppel.

[9] Counsel for the Farmers' Company contend that the decrees below may and ought to be sustained, notwithstanding its inability to restore all the property it received under the contract. While conceding that the general rule is that the rescission of contracts in equity should not be adjudged, unless the parties may be substantially restored to their financial situations before the contracts were made, either by the return of the property itself or a substantial equivalent therefor, they assert that this has been or will be done under the decrees below. They write in their brief that the return to Shearer and Wible of the stock they held in the Anchor Company would restore to them all of their share of the securities of that company deposited with the treasurer of Kansas to obtain and secure its license to do an insurance business in that state. Counsel for Shearer and Wible, on the other hand, write in their brief that the Farmers' Company took over all the property of the Anchor Company of every kind and nature, appropriated it all to its use and benefit, retains it, and that it completely put the Anchor Company out of business.

No evidence is cited in the brief for the Farmers' Company to the effect that the securities deposited by the Anchor Company to secure or retain its license were at the time of the hearing below, or that their proceeds were, or are now, or ever will be, available for distribution to Shearer and Wible as stockholders of the Anchor Company if the contracts are rescinded by the decrees of the court, and the stock which they formerly owned in that company is reconveyed and delivered to them. On the other hand, there is conclusive evidence that as long ago as February 4, 1915, the Farmers' Company, which then owned more than 90 per cent. of the stock of the Anchor Company,

caused the latter stockholders to adopt the resolution directing its board of directors to discontinue its business, to take down its deposited securities so far as it could do so, and to liquidate its affairs, that its business was discontinued, that its offices were closed, and its movable property taken to the offices of the Farmers' Company in Denver. A careful consideration of the evidence and the lack of evidence on this subject in the record compels the finding that the Farmers' Company has by the use of the Anchor Company and its stock appropriated to itself all the securities of the Anchor Company and the exclusive benefit thereof, whether they were deposited with the treasurer or superintendent 'of the state of Kansas, and that neither they nor their proceeds are or would be available for distribution to Shearer and Wible, if the contracts were avoided and the stock they formerly owned in the Anchor Company were reconveyed and delivered to them, and that this stock is worthless. Moreover, if those securities not requisite for the reserve were available or are available for restoration, still the great value of that stock would yet be lost to Shearer and Wible. The Anchor Company's insurance business cannot be restored, its policies, premiums, stockholders, are irrevocably beyond reach, its business is gone, and it cannot be regained.

[10] Counsel for the Farmers' Company assert, and opposing counsel deny, that Shearer and Wible and the Anchor Company were insolvent when the contracts were made and thereafter. There is no proof in these cases that either of them is, or ever was, insolvent. A corporation is not insolvent when the value of its property is far greater than the amount of its liabilities, and it is able to pay its debts when they mature, although the excess of the value of its property above its liabilities may be much less than the par value of its stock; and the finding here is that Shearer, Wible, and the Anchor Company were solvent.

There is no logical escape from the conclusion that neither the Farmers' Company nor the court can do equity in either of these cases by the restoration to Shearer and Wible of the stock in the Anchor Company which they owned, because the value of that stock when these contracts were made was $52,836.09, and its value now is nothing. That value then was the value of the share of the value of the property of the Anchor Company represented by that stock. All the property of the Anchor Company has been taken and appropriated to itself by the Farmers' Company, and it cannot restore it. It cannot bring back to that company its business, its policies, its stockholders, its contracts of insurance, its premiums payable therefor, its agents; and the only way in which a court can grant just and equitable decrees for the Farmers' Company in these cases is on the condition that it requires that company to do justice to Shearer and Wible.

Let the decrees in these cases be reversed, and let decrees be rendered therein in accordance with the views expressed in this opinion.