**COMMERCE TRUST CO. et al., v. WOODBURY et al. ***
No. 10028.

Circuit Court of Appeals, Eighth Circuit.
May 11, 1935.

*Rehearing denied June 24, 1935.

James E. Goodrich and Frank H. Terrell, both of Kansas City, Mo., John M. Holmes and Thompson, Mitchell, Thompson & Young, all of St. Louis, Mo., and Langworthy, Spencer & Terrell, of Kansas City, Mo., on the brief), for appellants.

Ellison A. Neel, of Kansas City, Mo. (Charles P. Woodbury, Phineas Rosenberg, and Cooper, Neel, Kemp & Sutherland, all of Kansas City, Mo., on the brief), for appellee Harold H. Woodbury.

William C. Michaels, of Kansas City, Mo., for appellee Thomas M. Barham, receiver.

E. R. Johnston, of Chicago, Ill. (I. N. Watson, Powell C. Groner, and Henry N. Ess, all of Kansas City, Mo., Poppenhusen, Johnston, Thompson & Cole, of Chicago, Ill., and Watson, Ess, Groner, Barnett & Whittaker, of Kansas City, Mo., on the brief), for appellees C. T. MacNeille et al.

William S. Hogsett, Chester L. Smith, Clifford Histed, and Hogsett, Smith, Murray & Trippe, all of Kansas City, Mo., for appellees Filer & Stowell Co. and Worden-Allen Co.

Rees Turpin, of Kansas City, Mo., and Leo Mann, of Milwaukee, Wis., for appellee Harnischfeger Sales Corporation.

Before WOODROUGH and FARIS, Circuit Judges, and DONOHOE, District Judge.

FARIS, Circuit Judge.

Appellee Woodbury, alleging the solvency of the Pickering Lumber Company, but its then inability to meet its obligations as they matured, on the 5th day of May, 1931, filed the original bill in this action. It was the conventional bill praying the court to take, by the appointment of a receiver, the properties of the Pickering Lumber Company, under its protecting aegis, and hold off its creditors till the defendant therein could again become financially rehabilitated.

The sole interest of appellee Woodbury is that he is the holder of 10 bonds of $1,000 each, out of an issue of $7,500,000 secured by a deed of trust on certain lands, timber lands, timber mills, plants, a railroad, and other properties, situated in three certain counties in California, as also by the stock of the Sugar Pine Railway Company, a railroad corporation under the laws of California. His legal status is that he is merely a potential deficit-judgment creditor of the

See, also, In re Pickering Lumber Co., 1 F. Supp. 82; Woodbury v. Pickering Lumber Co., 1 F. Supp. 92.

Guy A. Thompson, of St. Louis, Mo., and H. M. Langworthy, of Kansas City, Mo. (S. A. Mitchell, of St. Louis, Mo.,

lumber company, if and when such trust deed shall be foreclosed, and if the mortgaged properties enumerated shall not be sufficient to liquidate the bonds outstanding. No such foreclosure proceeding has up to now been had or sought.

It was a class suit and other creditors, secured and unsecured, with both liquidated and unliquidated claims have since come in or into a dependent ancillary proceeding, as general interveners, or as interveners pro interesse suo. Obviously, it was in the beginning a friendly suit, with a view of obtaining a friendly receivership. For the Pickering Lumber Company came in by answer, without service of process, and admitted all of the allegations of the original bill (as well as those in the intervention of Mastin & Co., to whom the Pickering Lumber Company owed $3,231 on open account), and consented to the appointment of a receiver. Thereupon, the judge nisi appointed George R. Hicks, the president of the company, as receiver.

Shortly thereafter, and on June 17, 1931, Woodbury, sole plaintiff in the original suit, filed a pleading entitled, "an application for instructions and directions to the receiver," and as relief inter alia, prayed an order of court directing the receiver forthwith to take into his possession the assets and properties of the Pickering Lumber Sales Corporation, and of other alleged subsidiaries of the Pickering Lumber Company, and hold and administer the same, as assets of the Pickering Lumber Company. Plaintiff Woodbury in his application set up in effect that the Pickering Lumber Sales Company, hereinafter called sales company, was a mere corporate shell, agent, and instrumentality, and the alter ego of the Pickering Lumber Company, hereinafter lumber company, for brevity. That the lumber company had fraudulently conveyed to the sales company vast and valuable properties in order to further the payment of, or in further security to appellant banks and another, to which the lumber company had been indebted on unsecured notes in the aggregate sum of more than $1,700,000.

The sales company had been incorporated under the laws of Delaware, in June, 1930, and in exchange for all the corporate stock of the sales company, and the assumption and payment of $2,203,856.23 of the pressing debts of the lumber company the latter had conveyed to it the retail lumber yards and other properties of the lumber company, all of which were unincumbered,

and of the value of $5,311,186. For brevity, cents omitted.

The antecedent facts and situation leading up to and moving the lumber company to incorporate the sales company and to make the transfer to it of the properties mentioned are lengthy and complicated.

The lumber company was organized in 1926, under the laws of Delaware. It had a paid-up capital stock of $7,500,000. It was formed by the consolidation of two or more long existing and prosperous lumber concerns. The president thereof, one W. A. Pickering, died suddenly on April 15, 1930, and George R. Hicks, mentioned above as having been appointed receiver, was induced to become president. He had long been president of the Bowman-Hicks Lumber Company, and was connected with other large lumber interests and concerns, and had a reputation for integrity and ability in the lumber business, second to none.

Upon an investigation of the financial condition of the lumber company, as shown by the balance sheet as of April 30, 1930, he found that the total assets of the lumber company were $38,353,696. Of these assets, $5,795,981 were current assets, and $30,281,925 were fixed assets. The difference is made up of current items due the lumber company, but slow and indefinite as to time of liquidation. The cash on hand and in banks amounted to $498,025.

At this same time, the current liabilities were $3,324,865, and the long-term liabilities (including the balance outstanding on the bonds of appellee Woodbury and others of $7,316,900) were $10,900,253. The above items (including depreciation of timber reserves and ordinary depreciation of $101,965) constituted the whole of the liabilities. Even subtracting capital stock of $7,500,000, which, of course, is not required, the lumber company thus had, as of April 30, 1930, a net surplus of $16,526,612, and so it was not insolvent within the purview of the Bankruptcy Act (11 USCA).

But the current assets of the lumber company were not in the ratio of two to one of its current liabilities, as seems to be advisable, if not a condition precedent, to the maintenance of a line of bank credit for manufacturing concerns. This situation came about by reason of congested maturities of the lumber company's financial obligations. Explaining it Mr. Hicks, the president and later receiver, said:

"As to the outstanding indebtedness of Pickering Lumber Company at that time;

the Company owed commercial banks a total of $1,700,000 all of which, of course, matured within six months. It had outstanding $850,000 of commercial paper, represented by some notes of various denominations, all of which matured within six months. There was past due on a timber purchase contract since March 1, 1930, on which, however, there was six months grace under the provisions of the contract, an item of $600,000. There was due on another timber purchase contract June 5, 1930, $100,000. That particular one was the Whiteside. There was due to the Detroit Trust Company in connection with the timber purchase $150,000 on July 1, 1930, being an installment of a prior mortgage to which the timber purchase contract was subject.

"There was due interest on the first mortgage bonds May 1, 1930, $220,500 and there would be due on November 1, 1930, additional interest of $220,500 and on November 1, 1930, there was an obligation to retire bonds in the principal amount of $150,000. In addition to the above there were accounts payable, many of which were past due, approximately $440,000. According to the records of the Company, there had been about $1,000,000 invested in the construction of the lumber producing plant at Alturas, California. The construction work had been suspended for some time prior to my association with the Company, at least, most of the work had been suspended, although there may have been some slight carrying on in the way of working on plans, etc. The buildings, or most of the buildings necessary to the plan, had been constructed, a log pond had been built, necessary dressing sheds, dry kilns, saw mill buildings, burner, necessary plant track had been laid; but, with the exception of such equipment and mill machinery as it was necessary to install simultaneously with such construction as had been carried on, none of the machinery had been installed."

In view of the situation above detailed by Mr. Hicks, and in view of the general financial situation, it was, as the special master finds, and we agree, "apparent that the Pickering Lumber Company could not have obtained additional funds either by further borrowings on the open market or by loans from banks other than those to which it was then indebted." As shown already, in the excerpt from the testimony of Mr. Hicks, the total bank indebtedness on April 30, 1930, was the sum of $1,700,-000. This indebtedness was due to the following banks, now here as interveners pro interesse suo, namely: Commerce Trust Company of Kansas City, Mo., $500,000; New York Trust Company of New York, $500,000; First National Bank in St. Louis, Mo., $250,000; Mercantile-Commerce Bank & Trust Company, of St. Louis, Mo., $250,-000; Anglo & London-Paris National Bank of San Francisco, Cal., $200,000.

Mr. Hicks, apprised of the situation and of the lumber company's congested maturities from estimates of the company's income and outgo and from Mr. Andrews, the company's general counsel, made it a condition of his acceptance of the office of president that he must have some reasonable assurance of the support of the interested banks. To this end he saw Mr. McLucas, who was then chairman of the board of the Commerce Trust Company of Kansas City, with the final result that a conference was called for April 30, 1930, at Kansas City, at which there appeared representatives of each of the creditor banks above-named, except the Anglo & London-Paris National Bank of San Francisco. There were present a representative of Geo. H. Burr & Co. which had sold commercial paper of the lumber company, to the amount of some $850,000, to numerous banks not mentioned above, and a representative (who left before the end of the conference) of Halsey, Stuart & Co., which had handled and sold the issue of $7,500,000 of bonds, secured by a part of the California lands and properties already mentioned. There is some small dispute as to who called this conference. It was probably called by Mr. McLucas; arguendo, this may be conceded, since we are not able to see that the identity of the proponent at all affects any legal situation involved in the case.

During this conference numerous proposed methods were suggested and discussed, as to rehabilitating the lumber company so as to enable it to carry on. It was finally agreed to organize and incorporate, under the laws of Delaware, a subsidiary to be named Pickering Lumber Sales Company, which, in consideration of all its stock and the transfer to it of $5,311,186 of the assets of the lumber company, should assume a large part of the primary liability for the current debts of the lumber company. Concretely what was mutually agreed to among the banks, the lumber company, and the then embryo sales company, was this:

"It was tentatively agreed with said banks and said George H. Burr & Compa-

ny (a) that said banks would carry their existing indebtedness of $1,700,000 for at least one year by successive 90-day renewals, (b) that George H. Burr & Company would lend for the same length of time and in the same way $200,000.00 to take up and retire an equal amount of the outstanding commercial paper, which then amounted to $800,000.00, and (c) that the banks and George H. Burr & Company would lend Pickering Lumber Company $600,000.00 of additional money to pay off and discharge the remaining commercial paper, and would advance another $100,000.00 for working capital for a new corporation, hereinafter called the 'Sales Company', provided the Pickering Lumber Company would do or cause to be done the following:

"(1) Procure a loan of approximately $1,000,000.00 which it was then thought could be obtained, to complete the construction of the lumber manufacturing plant at Alturas, above mentioned, upon which, at the time, approximately $1,000,000.00 had already been expended;

"(2) Obtain an extension for at least one year, and longer, if possible, of the said $600,000.00 installment of the West Side Lumber Company timber and plant purchase contract which had been past due since the preceding March 1, 1930;

"(3) Obtain an extension of the said $100,000.00 installment of the timber purchase contract indebtedness which would become due to the First National Bank at Duluth on June 5, 1930;

"(4) Obtain an extension of the said $150,000.00 installment of the timber purchase contract indebtedness which would become due to the Detroit Trust Company on July 1, 1930;

"(5) Organize a corporation, all of the stock of which would be owned and held by Pickering Lumber Company, and all of the directors of which would be named by Pickering Lumber Company, and to which new corporation would be transferred certain of the free and unencumbered assets of Pickering Lumber Company, consisting of the stocks of lumber on hand at the sawmills, substantially all of the wholesale lumber accounts and notes receivable and the retail yards, including the sites, buildings, stocks and accounts receivable of the retail yards, and miscellaneous, unencumbered real estate, such newly organized company to assume the debts due the banks, including the $200,000.00 aforesaid which George H. Burr & Company were to advance, mak-

ing a total of $1,900,000.00 and to assume the accounts payable of Pickering Lumber Company, except accounts payable for pay rolls, obligations for slash disposal, merchandise checks and coupons outstanding and personal injury awards, said Lumber Company to be left with $500,000.00 in cash or good accounts receivable for its own corporate needs, and other rights and privileges, and the Sales Company to enter into a contract with the Lumber Company to purchase from the Lumber Company the lumber subsequently manufactured by Pickering Lumber Company at a price to be stated in the contract; and

"(6) Give to said banks and George H. Burr & Company a mortgage, to secure the $700,000.00 of new money which they were to advance, on certain other free assets of said Lumber Company, consisting of a farm in Cass County, Missouri, of approximately 4100 acres, an office building in Kansas City, Missouri, on the corner of Eleventh and Central Streets, and a certain body of free and unencumbered timber in Northern California; it being believed that if said Alturas plant was completed, and the said short term debts refunded as above provided, said Pickering Lumber Company would be able to continue as a going concern and meet its obligations thereafter when and as they became due."

Compliance by the lumber company with clause (1), supra, was subsequently waived by the banks. The loan mentioned therein was never made and the plant at Alturas is yet unfinished, and since that time no money has been expended on it; none at least since this action began. It was further agreed, then or later, that the lumber company should guarantee the notes of the sales company, and that the latter might, if and when in funds, loan to the lumber company not to exceed $800,000.

Subsequently, and on June 19, 1930, another meeting was had, in which, in addition to the waiver of the loan to complete the Alturas plant, it was agreed, in order to provide the sales company with $100,000, and the lumber company with $500,000 of working capital, that the mortgage loan to the lumber company (item (5) in quotation above) should be increased from $600,000 to $700,000; the additional $100,000 to be transferred to the sales company. Before this, however, the Commerce Trust Company had advanced $137,500 to meet open market paper maturities, pending consummation of the plan. This sum it was agreed

should be repaid out of the said $700,000 secured loan.

Thereafter, on June 24, and in pursuance of the agreed plan, the sales company was incorporated with a capital stock of 1,000 shares, without par value, but with a capital of $1,000,000 and with $1,943,117 surplus. The transfer to the sales company by the lumber company of the $5,311,186 of unencumbered or current assets took place as of July 1, 1930. By this transfer, the lumber company sold and the sales company bought all of the lumber company's fifty-two retail lumber yards, all of its wholesale accounts receivable, all lumber, lumber products, and stocks of sashes and doors. The sales company agreed to purchase for one year all of the output of lumber sawed by the lumber company at a price of $1 per thousand feet, board measure, above cost of manufacture. This agreement was renewable or cancelable upon conditions not necessary to mention, because they are of no vital bearing on the controversy. Touching this contract, there was no evidence that it was either unjust or unreasonable.

In addition to conditions and considerations already set out, the sales company agreed:·

"In consideration for the lumber, retail yards, cash and accounts receivable, transferred and assigned or to be transferred and assigned to the Sales Company, the Sales Company will do the following things:

"(a) Simultaneously with the delivery hereof it will deliver to the Lumber Company One Thousand (1,000) shares of its capital stock, being all of its capital stock.

"(b) Simultaneously with the delivery hereof, or as soon thereafter as the same can be done, it will take up and cancel and return to the Lumber Company notes of the Lumber Company, now held by Commerce Trust Company of Kansas City, First National Bank of St. Louis, Mercantile Commerce Trust Company of St. Louis, the New York Trust Company of New York and the Anglo & London-Paris National Bank of San Francisco, aggregating Seventeen Hundred Thousand dollars ($1700,-000.00) principal amount.

"(c) Simultaneously with the delivery hereof, or as soon thereafter as the same can be done, it will take up, cancel and deliver to the Lumber Company its notes issued as commercial paper or for the retirement of commercial paper aggregating Two Hundred Thousand Dollars ($200,000.00) principal amount.

"(d) It will assume, pay and discharge when and as they become due the accounts payable, of the Lumber Company except the following accounts payable: Payrolls, obligations for slash disposal, merchandise checks and coupons outstanding and personal injury awards.

"(e) It will assume, pay and discharge when and as they become due the accrued taxes of the Lumber Company on its lumber manufacturing plants, lumber inventories and retail yards.

"(f) Out of the first moneys collected by the Sales Company on the accounts receivable transferred to it, it will pay to the Lumber Company such an amount as when added to the amount of cash which the Lumber Company has on hand at the time of the delivery hereof will aggregate $500,000.00.

"The Lumber Company agrees, however, to endorse or guarantee to .the satisfaction of the bankers, with whom the Sales Company exchanges its notes for Nineteen Hundred Thousand Dollars ($1900,000.00) for the Lumber Company's notes aforesaid for the same amount, the notes of the Sales Company and agrees to renew its endorsement or guaranty of said notes or any renewals thereof when and as often as the Sales Company may request it so to do."

After the transfer of a part of its current assets to the sales company, the balance sheet footings of the lumber company, as of June 30, 1930, showed current assets of $1,357,838 (not including stock of sales company), and fixed assets of $29,925,613; while the current liabilities (principally pay roll accounts) were $355,533, and long-term indebtedness, then amounted to $11,754,534, leaving net worth above all debts of about $23,959,169.

The sales company and the lumber company had the identical officers and directors; the lumber company then and now owns all of the capital stock of the sales company. As to business arrangements and segregation, the special master fairly reported this:

"The funds of the Sales Company were deposited in a separate account; a new separate set of books for the Sales Company was set up and maintained; the lumber purchased by the Sales Company was thereafter sold by the Sales Company in its own name and as its own property; letterheads, billheads, invoices and other stationery were changed by a rubber stamp to show the name of Pickering Lumber Company, and

new stationery was thereafter used by the Sales Company; the employees of the Lumber Company formerly engaged in connection with the sale of lumber by the Lumber Company entered the employ of the Sales Company and their salaries were paid by it. Wherever officers performed duties for the Sales Company as well as the Lumber Company their former salaries paid by the Lumber Company were prorated between the two companies.

"For sake of economy the Lumber Company and the Sales Company maintained offices in conjunction in Kansas City, Missouri, and the cost of the office space was likewise prorated between the two companies according to space used. Purchases by the Sales Company from the Lumber Company were paid by checks of the Sales Company drawn upon the separate bank account or accounts of the Sales Company. Afterwards specific deeds covering real estate in connection with the retail yards conveyed to Pickering Lumber Sales Company were executed and delivered to Pickering Lumber Sales Company and filed for record. Possibly in some instances there were delays, but these were only such as would be incidental to a transaction of this magnitude. The directors of the Sales Company held frequent directors' meetings, averaging approximately once a month during the period between the formation of the Sales Company and the present time. The evidence shows that the property and assets of the Sales Company were segregated from the Lumber Company and handled and treated by the Sales Company as its own."

From July 1, 1930, till the filing of this suit by appellee Woodbury, on May 5, 1931 (a period of more than ten months), both concerns functioned as well as the unexpected continuation of the existing nation-wide depression permitted. Within this period, and in accord with the contracts and agreements already mentioned, the special master found that these things were done in consummation thereof:

"On or about July 1, 1930, the Banks surrendered the notes which they then held and accepted in lieu thereof notes of the Pickering Lumber Sales Company in like amount due in ninety days after date endorsed and guaranteed by the Pickering Lumber Company, said notes bearing interest at the rate of 5½ per cent per annum instead of 6 per cent per annum which said former notes bore and on or about the same date George H. Burr & Company loaned to Pickering Lumber Sales Company the sum of $200,000 and received in consideration therefor a note or notes aggregating a like amount from Pickering Lumber Sales Company, endorsed and guaranteed by Pickering Lumber Company, and providing for the same maturity as those received by the Banks, but bearing interest at the rate of 6 per cent per annum.

"Simultaneously with the consummation of these transactions between the Lumber Company and the Sales Company, and on or about July 1, 1930, the Pickering Lumber Company executed and delivered to the Commerce Trust Company, as trustee, a mortgage, on the farm, office building, and the West Macdoel tract, and the Banks and George H. Burr & Company loaned to the Lumber Company (by advances made between July 2, and October 3, 1930, to meet the varying maturities of the outstanding commercial paper) the total aggregate sum of $700,000, of which $100,000 was to provide the initial casecapital of the Pickering Lumber Company and $600,000 for the retirement of a similar amount of commercial paper. The entire $800,000 in outstanding commercial paper was taken up and paid at maturity, $600,000 by the Lumber Company out of the proceeds of the $700,000 first mortgage loans and $200,000 by the Sales Company."

Neither notice nor knowledge of the formation of the sales company and of the transfers to it came to all of the creditors; particularly is this true as to those concerns which had executory contracts to furnish equipment and machinery for the completion of the Alturas plant, then building in California. None of this equipment and machinery has ever been delivered, and none even manufactured, except that being built by Filer & Stowell Company, and even this has never been delivered. But such indicia, as the physical nature of the properties and situation admitted, were used. Signs were placed over the office of each of the lumber yards and posted about the mills and lumber yards of the lumber company, showing the change of ownership. Notice of this change found its way into the public press in Kansas City, and into credit reports of general credit agencies and into the lumber journals. It was discussed by Mr. Hicks, with parties holding timber purchase contracts, and with others desiring information.

At the end of about ten months, it was again apparent that the lumber company

could not meet its remaining obligations as they matured, and the original creditors bill herein was filed, followed as already said, shortly thereafter, by the application of appellee Woodbury to the court to instruct the receiver to summarily take into his possession and to administer as a part of the properties of the lumber company all of the assets of the sales company. As receiver of the lumber company such receiver then held all of the capital stock of the sales company.

In the original bill, there were no parties save Woodbury, plaintiff, and Pickering Lumber Company, defendant. The application for the summary order was filed in the original suit. No new parties were added, and none was brought in by formal process in equity. Later on, as forecast, many other creditors, including three contractors for equipment and machinery for the Alturas plant, members of the bondholders' committee, representing bonds of the same issue as those held by Woodbury, came in and filed interventions. Still later on, the Commerce Trust Company, First National Bank in St. Louis, Mercantile-Commerce Bank & Trust Company, New York Trust Company, Anglo California National Bank of San Francisco (formerly Anglo & London-Paris National Bank), and Burr, Stevens & Co., Inc. (formerly Geo. H. Burr & Co.), came in by special interventions pro interesse suo, and participated in the hearing. This application for a summary order was assigned for hearing to Cyrus Crane, Esquire, of Kansas City, Mo., as special master to hear evidence and report to the court his finding of facts and conclusions of law thereon. It is not deemed important in the view we are constrained to take of the case that the special master was required to and did give notice to appellants herein, but that these appellants did not enter their special appearance as interveners pro interesse suo, for some eight months after the appointment of the special master, and after practically all of the evidence had been heard.

The special master made a long, able, and careful report of his conclusions of fact and law. His final conclusions of law, so far as such conclusions are pertinent to the matter herein up for judgment, are as follows:

"The Court should not direct the Receiver to disregard the corporate entity of the Pickering Lumber Sales Company and take possession of its assets as a part of the assets or property of the Pickering Lumber Company either directly or by suit insti-

tuted for that purpose. This because the Sales Company is a separate corporate entity from the Lumber Company, it was not created in fraud, nor has it been used to accomplish a fraudulent or wrongful purpose; neither is it an instrumentality, agency, adjunct, dummy or alias of the Lumber Company, nor did its creation result in establishing constructive fraud.

"Through stock ownership the affairs of the Sales Company should be handled and managed by the Receiver under the advice, directions and orders of the Court. The entire stock of the Sales Company is an asset in the hands of the Receiver, and should be administered as such—that is in important matters—by seeking consultation with the advice and directions from the Court.

"The Court should direct the Receiver to arrange for the payment of the May 1st, 1931, coupons on bonds held by those persons who did not deposit their bonds with the Bondholders' Protective Committee, out of the assets of the Sales Company, if that is possible. If not possible, then such non-depositing Bondholders should be given on proper application and order priority as to such coupons either on reorganization or final distribution. In any event they should be put on an equality with depositing Bondholders."

We have omitted two clauses of the special master's conclusions. One has reference to the removal of Mr. Hicks as receiver. This point is now moot, since Mr. Hicks has removed himself by resigning, on January 2, 1934, and Mr. Thomas M. Barham was on the above date appointed in his stead. The other omitted clause refers to the anomalous position taken by the attorney for the receiver. Since the latter matter is irrelevant and the former moot, space is not given them.

To the report of the special master exceptions were filed by the appellees. These exceptions were sustained by the court, both in a memorandum opinion and in the findings of fact and conclusions of law filed in the case by the court. Thereupon the order or decree appealed from was entered. This decree, in so far as it directly concerns the appellants here, ordered the receiver of the lumber company to disregard the corporate entity of the sales company, and forthwith to take possession of all and singular its properties mixed, real and personal, books, papers, records, choses in action, credits, claims, profits, increments, and muniments

of title, wherever found, being, or situate and conversely, it ordered the sales company, which was not a party to the proceeding, or to the bill of complaint, to deliver over all of its said properties to the receiver. The decree also ordered the several appellants, banks, and Burr, Stevens & Co., to pay to the receiver of the lumber company, all money received by them respectively from the sales company, under the agreements herein above recited and as partial payments on the notes made by the sales company to said banks, appellants, and Burr, Stevens & Co., together with interest thereon at 6 per cent. The sums so ordered to be repaid, or paid to the receiver by said banks and Burr, Stevens & Co., were as follows: First National Bank in St. Louis, $152,500; Commerce Trust Company of Kansas City, Mo., $290,000; New York Trust Company of New York, $275,000; Mercantile-Commerce Bank & Trust Company of St. Louis, Mo., $137,500; Anglo & London-Paris National Bank of San Francisco, Cal., $110,000, and Burr, Stevens & Co., $80,000. Other parts of the decree seemingly fall into the category of administrative details, which do not require discussion, and which may be ironed out hereafter, even though we assume that the appeal at bar necessarily includes them.

Other facts from the record, if it shall become necessary to render understanding clear, will be set out in our discussion of the law. Many such have no doubt been presently overlooked, in a record which contains some 900 pages, briefs of some 1100 pages, and more than 600 citations of authorities.

The errors relied on by appellants for reversal are, as written, 70 in number, and take up 128 pages of the so-called "brief" of appellants. Since judicial notice may be taken of the fact that this is not the only case which this court will be called on to consider in the next two years, it is impossible to set down, deal with, and discuss each and every error urged. Typewriters, printing, dictaphones, and stenography, all concededly great inventions, even if sometimes "necessary evils," as here, have added monumentally to the labor of courts.

In the view we are constrained to take of this case, but three of the cloud of errors suggested need be discussed and ruled in order to decide this case. These are: (a) Did the trial court err, upon the whole record, in finding and decreeing that the sales company was a mere agency, department, and instrumentality of the lumber company, possessing no corporate entity which entitled it to legal respect, and, as a corollary, ordering it to be dealt with by the receiver without regard to its prima facie corporate character? (b) Did the trial court err in that part of its judgment and decree which ordered the appellants to return to the receiver of the lumber company (by the several and plenary judgments found among the facts) the aggregate sum of $1,045,000, with interest? and (c) As a corollary to the first question, can the receiver take over the properties of the sales company without paying its debts?

Obviously, the inquiry and discussion rendered necessary has nothing to do, except merely as an incident, with the original bill of complainant, Woodbury, wherein the receiver was appointed. As the court below found, and as we understand, no attack is made on the necessity or propriety of the original bill, save perhaps, the incidental suggestion by appellants that they were not named as parties therein, and whatever bearing, if any, such latter fact may have on the validity of the plenary money judgments rendered against them.

Imprimis, and in order to eliminate any discussion as to the legal effect of actual fraud, it is well to observe that there was no actual fraud, or fraudulent intent in the minds of these who participated in the creation of the sales company. No one, we are of opinion, can read the record and reach a contrary view. The special master so found, as did likewise the learned trial judge, who expressed his views of the fact in lucid and unmistakable language, thus:

"At the outset, intentional wrong or active fraud should be eliminated from all consideration. The motives of the parties cannot be impugned. It was the object of each and every one connected with the formation of the subsidiary to reestablish the credit of the defendant and thereby enable it to 'carry on'. This was deemed in the interests of stockholders, bondholders, lien holders, general creditors, and such interests as the public might have in the continuing operation of a previously prosperous and successful business. Moreover, at the time of the transactions complained of, all the parties had every reason to believe that there would be a marked improvement in the then economic conditions and that the defendant would at an early date be freed of its finan-

cial embarrassment and in a position to continue its once successful operation. There was neither actual fraud nor bad motives."

In considering the contentions of creditors that the transfer to the sales company was fraudulent when made as to them, it must be borne in mind that those only who are complaining are: (a) The bondholders, representing at the time a little more than $7,000,000; (b) the "machinery creditors"; and (c) one general creditor having a claim of some $3,200. These bonds of these bondholders are secured by property, not at all affected or dealt with, and worth as appraised, nearly $16,000,000. The claims of the machinery creditors arise out of unexecuted contracts, which were unliquidated then, and now, so far as the record discloses. As already said, the question whether these bondholders will ever be creditors depends wholly on whether, when foreclosure is had, the specific property which secures these bonds shall on sale bring enough to pay them; if it shall not, then the deficit will, of course, become a charge against all property of the lumber company. Conversely, if the mortgaged properties shall bring the amount of the debt, it is merely trite to say that subsequent events will interest them no more.

Few questions of law are better settled than that a corporation is ordinarily a wholly separate entity from its stockholders, whether they be one or more. In re Collins (C. C. A.) 75 F.(2d) 62; Wilson v. Crooks (D. C.) 52 F.(2d) 692; Majestic Co. v. Orpheum Circuit, Inc. (C. C. A.) 21 F.(2d) 720; Owl Fumigating Corporation v. California Cyanide Co. (D. C.) 24 F.(2d) 718, loc. cit. 719; Pullman's Palace-Car Co. v. Missouri Pacific Ry. Co., 115 U. S. 587, 6 S. Ct. 194, 29 L. Ed. 499. Likewise, we think it must be conceded that neither ownership of all of the stock of one corporation by another, nor the identity of officers in one with officers in another, creates a merger of the two corporations into a single entity, or makes one either the principal or agent of the other. Owl Fumigating Corporation v. Cyanide Co. (D. C.) 24 F.(2d) 718; Corsicana Bank v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141; Marsch v. Railroad, 230 Mass. 483, 120 N. E. 120; Richmond, etc., Co. v. Richmond, etc., Ry. Co. (C. C. A.) 68 F. 105, 34 L. R. A. 625. But notwithstanding such situation and such intimacy of relation, the corporation will be regarded as a legal entity, as a general rule, and the courts will ignore the fiction of corporate entity only with caution, and when the circumstances justify it, and when it is used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud.

But, notwithstanding this, we are constrained by the uncontradicted facts to the conclusion that the sales company was, as it was controlled, and as it functioned, merely an agency or department of the lumber company. All of its assets were furnished, and all of its stock owned by the lumber company, its officers, directors, and its main office were the same as those of the lumber company, and its employees had, for the most part, formerly been employees of the lumber company. But the strongest undisputed facts constraining us to this conclusion are that the president of the lumber company had the power to vote all of the stock of the sales company, and aside from this power, which was not of itself unusual, had the power to remove any officer or director of the sales company without cause or notice, and to dominate and control performance of its contracts. Moreover, the sales company did nothing not theretofore done by the lumber company, which in forming it only split its business into a manufacturing department which it retained, and a sales department which it transferred to the sales company, but over which it retained thorough going, ultimate control. Trustees System of Pennsylvania v. Payne (C. C. A.) 65 F.(2d) 103; Page v. Arkansas Natural Gas Corp. (C. C. A.) 53 F.(2d) 27; Industrial Research Corp. v. General Motors Corp. (D. C.) 29 F.(2d) 623; Hamilton Ridge Sales Corp. v. Wilson (C. C. A.) 25 F.(2d) 592; Detroit Motor Appliance Co. v. General Motors Corporation (D. C.) 5 F. Supp. 27; Edward Finch Co. v. Robie (C. C. A.) 12 F.(2d) 360; United States v. Lehigh Valley R. Co., 254 U. S. 255, 41 S. Ct. 104, 65 L. Ed. 253.

In such situation, there are cases which hold that a receiver of the parent company, under the order of the court, may take over the property of the subsidiaries which fall into the banned category above described and administer such property, as the property of the parent company. T. L. Smith Co. v. Orr (C. C. A.) 224 F. 71; In re Eilers Music House (C. C. A.) 270 F. 915; Chicago, etc., Co. v. Bank (C. C. A.) 234 F. 41. Concededly, the above proposition of law must meet difficulties in the case at bar. For here, neither Woodbury, the original plaintiff in the creditor's bill, nor Mas-

tin & Co., nor Filer & Stowell Company, nor the other creditors holding executory contracts, had any right to attack in equity the validity of the transfer to the sales company. This is so, for the very plain and fundamental reason that neither a bondholder whose bonds were not secured by property transferred, as was Woodbury's situation, nor a simple contract creditor, as was the situation of the intervening appellees, may maintain an action to attack or set aside a transfer as fraudulent and in derogation of creditors' rights. Carson v. Long-Bell Lumber Corp. (C. C. A.) 73 F. (2d) 397. Having no standing themselves to act, they should not ordinarily be heard in an attempt to move the receiver to do so. One who cannot do a thing directly should not be permitted to do a thing indirectly. In short, having no legal or equitable standing, they should in law and equity be impotent to confer standing on another.

But another difficulty on the latter point is met in this case. The appellants came in on the side of the defendant lumber company, as interveners pro interesse suo. In their several interventions they categorically set out that they came in recognizing "the propriety of the above-entitled cause and the jurisdiction of this court to entertain such cause and the validity of the appointment of George R. Hicks, as receiver." Appellants have not raised the point that plaintiff herein had no standing to institute or maintain this action, and having made the admission set forth, we think it cannot now be raised by appellants, even though apparent on the record. Another reason for this view is that in and by the answers of appellants to the application of Woodbury, and in their prayers for relief, they went further than was necessary to the protection of their rights as interveners pro interesse suo, for that they prayed that the transfer to the sales company be upheld on legal and equitable grounds. We are of the view that in these several ways they became general interveners or at least entered their general appearances. Had they merely asked that if the transfer to the sales company should be overturned, then they be held to be entitled to payment out of the assets of the latter, it might well have rendered them only special interveners pro interesse suo.

The special master found that on June 30, 1930, that is on the date of the transfer complained of and after this transfer, the lumber company was not insolvent. This is, of course, the crucial date and not that of May 5, 1931, when the bill herein was filed. The court nisi, disagreed with the finding of the master on the point and was of the specific view that the lumber company was on June 30, 1930, insolvent. Counsel for appellees contend for insolvency, but say that it makes no difference. It is rather obvious, we think, that it does make a vast difference whether the lumber company was, or was not insolvent when it made the transfer to the sales company. Whether it was or was not insolvent on May 5, 1931, is presently of no particular relevance, since it is clear that its insolvency on the latter date, if it existed, was not due to the transfer, but to an unexpected continuation of bad business conditions and a constantly falling market for lumber and the consequent depreciation of its land, timber, and plants produced thereby.

Neither the statutes of Elizabeth, nor section 3117, R. S. of Mo. of 1929 (Mo. St. Ann. § 3117, p. 1946), which is based thereon, makes any reference to insolvency. But in construing and applying these statutes courts have often found it necessary to say when a person is or is not solvent. From the cases adjudicated, nothing is plainer than that insolvency has in law various meanings (32 C. J. 805 et seq.), or to be more accurate, its constituent elements differ. One is insolvent for the purposes of a creditor's bill so-called to appoint a receiver for his properties, when he is unable to pay his obligations as they mature; likewise this is the test which warrants the vendor in refusing to deliver goods on a continuing contract, and in exercising the right of stoppage in transitu. It was the test of insolvency as to traders, at least, under the Bankruptcy Act of 1867 (14 Stat. 517). It would have been the test to apply in the case at bar had there been a contest on May 5, 1931, touching insolvency.

But the question here is, Was it the test on June 30, 1930, when the lumber company transferred a large part of its free assets to the sales company. We think the construction put on section 3117, supra, by the courts of Missouri, where the dealings were had, are controlling; since said section, though it followed in effect the Statutes of Elizabeth, was yet enacted in lieu thereof.

It is, and long has been, the settled law of Missouri that solvent or insolvent, a person may prefer any creditor, by payment of the debt of the latter in whole, or in part, and no other creditor may be heard to complain. But in Missouri the rule changes

under the above statute whenever such transfer constitutes a gift, or includes more property, or assets, than are sufficient to pay the just debt of the creditor to whom the transfer is made. In such latter event the presumption of a violation of the provisions of section 3117, supra, arises against the transferee, and the burden shifts to him to overcome this presumption. Ordinarily, the presumption favors the validity of a transfer. But when the transfer constitutes a gift, or when by the transfer a creditor takes more than his debt, the presumption shifts, and unless rebutted, the gift, or transfer must be set aside. It is settled in Missouri, by many cases, that this presumption may be met and rebutted by proof of solvency at the time of the conveyance or transfer. True, in the case at bar, none of the appellants took or got more than its debt. Five of them abated a substantial part of future interest, and they have been actually paid but a little more than one-half of their debts. But they were parties benefited by a transfer whereby, with their knowledge, their substituted debtor took more than was necessary to pay their debts in full. So, unless the record here shows that when the lumber company made the transfer to the sales company, it was solvent within the purview of section 3117, supra, the defense of appellants, that they were creditors whom it was lawful to prefer, must fail. And this is the figure which solvency vel non cuts in this case.

 We think insolvency in Missouri, as in practically all jurisdictions, having occasion to apply the word to alleged fraudulent conveyances, stands fairly in accord with the definition found in the Bankruptcy Act of 1898. Therein a person is defined as insolvent "whenever the aggregate of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts." Section 1 (15), title 11 USCA. Excluding, of course, as the statute says, such property as may have been conveyed in fraud of creditors. Manifold confusion is found in the cases. A mere reference to 32 C. J. 805, supra, proves this conclusively. This confusion has arisen obviously from the fact that in many cases the courts, as also counsel in their citations, paid no attention to the nature of the case from which the definition was taken when they were called on to define insolvency, or its antonym, solvency. In some cases, both definitions are found in the same case. Cf. Bushman v. Bushman, 311 Mo. 551, loc. cit. 564

and 566, 279 S. W. 122; May v. Gibler, 319 Mo. 672, loc. cit. 677, 4 S.W.(2d) 769. In others, the two definitions are combined. Shearer v. Insurance Co. (C. C. A.) 262 F. 861, loc. cit. 875. But the rule in Missouri, whenever the courts have been called on to construe and define that solvency, which is meet to rebut the presumption of fraud in an alleged fraudulent conveyance, have rather uniformly adhered to what is the present rule in bankruptcy. Judson v. Walker, 155 Mo. 166, 55 S. W. 1083; Snyder v. Free, 114 Mo. 360, 21 S. W. 847; Walsh v. Ketchum, 84 Mo. 427; Eddy v. Baldwin, 32 Mo. 369; Patten v. Casey, 57 Mo. 118.

In the case of Hoffman v. Nolte, 127 Mo. loc. cit. 120, 135, 29 S. W. 1006, 1009, the court said:

"In Snyder v. Free, 114 Mo. [360] 350, loc. cit. 369, 21 S. W. 847, this court approved the statement extracted from the various decisions by Mr. Bump in his work on Fraudulent Conveyances (pages 276 and 277), to this effect: 'The burden of proof rests upon the donee to establish the circumstances which will repel the presumption of a fraudulent intent. The conveyance stands condemned as fraudulent unless the facts which may give it validity are proved by him. If no evidence is given to show that the donor had ample means to meet his liabilities, then the transfer must be deemed void as against creditors.'

"In Walsh v. Ketchum, 84 Mo. 427, the prior cases in this state were reviewed, and the rule announced in Patten v. Casey, 57 Mo. 118, was approved, to this effect: 'That a voluntary conveyance made by a debtor in embarrassment or doubtful circumstances, without ample means, outside of the particular property conveyed, for the satisfaction of his then existing debts, though made without any specific intent to defraud, is fraudulent in law as to all who were creditors at the time of the execution of the conveyance.'"

Again, in the same case the Supreme Court of Missouri said:

"The solvency required by an unbroken line of decisions in this state, essential to protect a voluntary gift, consists not only in the present ability of the debtor to pay his debts, but in such a condition of his means that payment can be enforced by process of law. Eddy v. Baldwin, 32 Mo. 369; State ex rel. v. Koontz, 83 Mo. 323."

No consolation is afforded to those who may insist on the so-called equity definition

by the use of the words, "present ability of the debtor to pay his debts." This simply means that the debtor must have assets, which he may presently convert into cash, with which to pay. This view is corroborated by the first citation, in which is quoted as authority, the long standard work, Bump on Conveyances, as also by the common sense of the thing.

In the very late case of Carson v. Long-Bell Lumber Corporation, 73 F.(2d) 397, at page 402, this court said:

"The court found that the Long-Bell Lumber Company was not insolvent when the bills were filed, nor at the time of trial, though it was financially embarrassed as a result of the depression which had affected it and all other similar industries; that its present inability to pay certain of its obligations was solely caused by the depression, and was not the result of any mismanagement or fraud on the part of the officers and directors of the company."

Upon principle, and on the decisive facts up for judgment therein, the Carson Case, supra, is hardly to be distinguished from the case at bar. In the Carson Case, however, the sales company had been given more freedom of action and was less subjected to parent company control than in the case at bar. If the Long-Bell Company, unable as the court below found and this court found to pay certain of its obligations as they matured, was not insolvent when it made the transfer of current assets to the sales company, which it incorporated, it is difficult to see why the lumber company was insolvent when it made a similar transfer to the sales company in the case at bar. So, we are forced to agree with the finding of the special master and to disagree with the court nisi on the question of insolvency. Any creditor of the lumber company armed with an execution, could, at any time, after the transfer, and till the original bill was filed, have found ample free assets sufficient to pay his debt in full.

■ The contention is made by appellants that the delay, for almost one year to take any action in the case constitutes laches, for that, it is now impossible to restore to appellants what they have lost by the failure to move, or make earlier objection. This contention, like many others in this confused and complicated case, presents a difficult and an anomalous situation; because, we find that those who finally moved had no legal or equitable right to do so. Obviously, it is difficult to enforce the doctrine of laches against those who even up to now have no right to proceed. Because we take it, the doctrine of laches connotes the existence of some one having a present right to act, but who omits, or neglects to act till the adversary party has been put into a position wherein action would be hurtful and inequitable and put him at great disadvantage. But the fact remains that from June 30, 1930, till June 17, 1931, all creditors stood by, seemingly hoping that the situation would work out successfully, and in the meantime as the record fairly indicates, and the brief of appellants fairly sets out, the situation had changed to the hurt of appellants. We quote from the brief, thus:

"During such period the position of the parties entirely changed. For a number of months the banks were advancing new money on the $400,000 loan to pay off the commercial paper that fell due. Accounts payable, as well as commercial paper obligations, were being paid. Bonds were being retired. Installments on the timber purchase contracts were being paid. The appellants, on the other hand, were not being paid, but were periodically extending their notes. The deposits of the Lumber Company with the banks, available as an offset before the Sales Company transfer, were used to pay others. General creditors of the Lumber Company, in the same class as the appellants had been, were paid off to the extent of nearly a million and a half dollars. While the appellants were extending their notes, what had been supposed to be a mere temporary business recession, was developing into one of the greatest and most disastrous depressions in history. The Pickering properties, like all other properties during that period, were depreciating tremendously in value."

In this situation it would be inequitable and unjust to require appellants to wholly change their situation, or to repay so much as has been already paid to them on their obligations. Neither do we think, since actual fraud was absent and solvency existed, and other creditors were not hindered or delayed, the sales company's assets should be taken over by the receiver save upon condition that the receiver shall first pay all of the debts of the sales company, including the balance due to appellants. Appellants should not be penalized because they were well-meaning parties in an effort to save a vast enterprise; even though some part of their efforts was due to better secure their own claims. This, as already indicated, was a preference of creditors,

which was not unlawful. Burston v. Fennewald, 222 Mo. App. 128, 2 S.W.(2d) 824, 828; Schufeldt v. Smith, 131 Mo. 280, 31 S. W. 1039, 29 L. R. A. 830, 52 Am. St. Rep. 628; Foster v. Planing-Mill Co., 92 Mo. 79, 4 S. W. 260.

As the special master correctly concluded, each case of this character stands upon its own facts. Rarely are any two exactly similar. Having found that creditors were not delayed or hindered by what was done, that is, by the conveyance of only a relatively small part of the lumber company's assets, no occasion arises to discuss Shapiro v. Wilgus, 287 U. S. 348, 53 S. Ct. 142, 77 L. Ed. 355, 85 A. L. R. 128, or any other of the cases cited wherein all of the debtor's property was conveyed to a subsidiary, or to an individual.

We conclude that, because the sales company was only an agency or department of the lumber company; because it was wholly dominated and controlled by the latter; because it performed no new function, and because it was a mere splitting up of the lumber company's business, the trial court was correct in requiring it to be taken over and administered by the receiver of the lumber company. But we are constrained to the view that the facts, the situation and the law, did not warrant the court in refusing to adjudge that appellants be first paid out of the assets of the sales company, nor do the facts and the law, in the view we take of the case, warrant the judgments against appellants, that they repay to the receiver what they have already been paid on their claims. Other provisions of the decree do not seem to affect the appellants, or to be within the purview of their appeal, save only such incidental effect, if any, as may be worked by the receiver's taking over the assets of the sales company. These other provisions, it may well be, may be ironed out by mere administrative orders. If, after paying all debts of the sales company, including the debts due to the appellants, there shall be a surplus, it shall be regarded as an asset of the lumber company for the payment of its general creditors; if there shall not be among the assets of the sales company sufficient funds to pay all of its debts, including those of the appellants, the residue of such debts should be allowed as general claims against the lumber company.

It follows that the decree should be modified to accord with the views expressed herein, and, as modified, affirmed; costs to be taxed, one-half against appellants and one-half against appellees.

Modified and affirmed.