**E. ALBRECHT & SON, Inc., v. LANDY, Collector of Internal Revenue.**

No. 11598.

Circuit Court of Appeals, Eighth Circuit.

Aug. 19, 1940.

William H. Oppenheimer, of St. Paul, Minn. (Robert F. Leach and Oppenheimer, Dickson, Hodgson, Brown & Donnelly, all of St. Paul, Minn., on the brief), for appellant.

Milford S. Zimmerman, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Sp. Asst. to the Atty. Gen., and Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for appellee.

Before GARDNER and SANBORN, Circuit Judges, and COLLET, District Judge.

COLLET, District Judge.

Appeal from a judgment in favor of the Collector of Internal Revenue for the District of Minnesota, on a claim for refund of manufacturers' excise taxes.

By Section 604 of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 609, effective June 21, 1932, there was imposed a manufacturers' excise tax on articles made of fur equivalent to ten per cent of the selling price.[1] Section 619 of the same Act, 26 U.S.C.A. Int.Rev.Code, § 3441, provides that if such an article is sold at retail, on consignment, or at less than the fair market price, the tax shall be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers. Such price to be determined by the Commissioner of Internal Revenue.[2]

For seventy-seven years prior to June 21, 1932, the business now owned by E. Albrecht & Son, Inc., had been engaged in manufacturing garments made from fur. In 1915 a wholesale department was established for the purpose of promoting and handling sales to retailers. From that date forward the business was divided into three departments, consisting of (1) manufacturing, (2) wholesale, and (3) retail. All departments of the business are and were housed in the same building in St. Paul, Minnesota, with the exception of one additional retail store in Minneapolis, Minnesota. Early in 1932, it became apparent to those interested in the fur business that Congress would soon pass the manufacturers' excise tax heretofore referred to. In an effort to avoid the payment of that tax, after the act had been passed and approved and only five days before its effective date, a new corporation was created by the owners of the existing corporation to be utilized for that purpose. In order to avoid confusion, the original corporation, appellant here, will be referred to as the Manufacturing Company. The corporation created in 1932 will be referred to as the "Selling Company". On June 20, 1932, the day before the effective date

---

[1] Section 604, Revenue Act 1932, 26 U.S.C.A. Int.Rev.Acts, page 609. "There is hereby imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold: Articles made of fur on the hide or pelt or of which any such fur is the component material of chief value."

[2] Subsection (b) Section 619, Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Code, § 3441(b):

"(b) If an article is—
"(1) sold at retail;
"(2) sold on consignment; or
"(3) sold (otherwise than through an arm's length transaction) at less than the fair market price;
the tax under this title shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner."

of the act, by formal bill of sale all of the finished articles owned by the Manufacturing Company, together with all orders for articles uncompleted, completed but not delivered, and all orders for repair work on hand at the time, were transferred to the Selling Company. No consideration passed from the Selling Company to the Manufacturing Company other than the transfer of the entire capital stock of the former to the latter. No profit was made by the Manufacturing Company on the transaction. It is admitted by appellant Manufacturing Company that the transfer was for the purpose of effecting a sale and transfer of all fur stock from the Manufacturing Company to the Selling Company prior to the effective date of the taxing statute thereby avoiding the tax on sales by manufacturers. Subsequent to June 20, 1932, all of the selling operations were performed by the Selling Company which did no manufacturing. The same persons served as officers of both corporations and many of the employees served both. Their salaries were allocated to each on a percentage basis. As was done before the creation of the Selling Company, each of the three departments were strictly segregated, but after the formation of the Selling Company a separate set of books was kept for that company covering the wholesale and retail operations, which operations were shown as the business of the Selling Company alone. The president of the Manufacturing Company testified that if it had not been for the passage of the excise tax act the Selling Company would probably not have been created. The public generally was not advised of its creation and merchandise continued to be sold under the trade-name of "E. Albrecht & Son" and under the trademark "Albrecht Furs." No changes were made in bills or invoices and the use of shipping tags containing the legend, "From E. Albrecht & Son, Manufacturers of Albrecht Furs, Founded 1855", continued.

The Commissioner of Internal Revenue and the trial court disregarded the sale of June 20, 1932, upon the ground that the transaction was not a bona fide sale. The court entered judgment applying the tax to all articles (1) completed and in the stock of the Manufacturing Company and transferred by it to the Sales Company prior to June 21, 1932, but not actually sold and delivered prior to that date; (2) articles in the process of manufacture, together with all necessary furs and materials for the completion thereof; (3) repair jobs transferred by the June 20th conveyance which were not completed until after the effective date of the Act; and (4) repair items completed before June 21, 1932, but which were not delivered or invoiced to the customer until subsequent to that date.

■ Although a parent corporation and its wholly-owned subsidiary may for certain purposes and under proper circumstances be treated as separate entities,[3] the finding of the trial court that the Selling Company was merely the adjunct and instrumentality of the Manufacturing Company, organized in an attempt to avoid the excise tax applicable to manufacturers, is amply supported by the foregoing facts. The conclusion reached by the trial court that under such circumstances the parent corporation will not be permitted to use its subsidiary as a device by which it may evade its responsibilities, is the well-established rule.[4] The trial court properly ignored the creation and existence of the Selling Company in applying the manufacturers' excise tax. The determination of the proper amount of those taxes remains.

The Commissioner of Internal Revenue computed the tax assessment against the Manufacturing Company upon the price at which completed garments were sold by the Selling Company to retail merchants. That action was approved by the trial court. The application of the price at which the Selling Company sold the garments as the basis for the computation of the tax is assailed upon the ground that this price did not represent the price at which the garments would sell, "in the ordinary course of trade, by the manufacturer (s) or producer (s) thereof," which latter price is asserted to be the price contem-

[3] Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, loc. cit. 487.

[4] Wabash Ry. Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335; Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, loc. cit. 487; Bourjois, Inc., v. McGowan, 2 Cir., 85 F.2d 510; Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229.

plated by the statute as the basis for determining the amount of the tax.[5]

■ By its finding of fact the trial court found that the alleged sales made by the Manufacturing Company to the Sales Company on June 20, 1932, and subsequently, were not made in the ordinary course of business, were not "arms-length transactions", were at prices less than the fair market price and less than similar articles were sold in the ordinary course of trade and business. It further found that the fair market price of the goods sold by the Manufacturing Company through the Selling Company subsequent to June 20, 1932, was the market price determined by the Commissioner of Internal Revenue in his assessment against the Manufacturing Company, to-wit: where the articles were sold at retail by the Sales Company, the price at which those articles would have been sold at wholesale, shown by the books of the Manufacturing Company; and where articles were sold at wholesale by the Sales Company, the wholesale selling price obtained therefor; and where articles were sold at a sacrifice, and at less than the market wholesale selling price, a price of twenty per centum less than the selling price. If those findings are supported by any substantial evidence they will not now be disturbed on appeal.

■ As heretofore noted, ample grounds existed for the finding that the sale of June 20, 1932, to the Selling Company was not bona fide. The same facts which justified that conclusion warrant the finding that the sale of all articles transferred by the June 20th transaction and sales subsequently made by the Manufacturing Company to the Sales Company were not "arms-length transactions" made in the ordinary course of business. Whether those sales were at prices less than the fair market price, requires consideration of facts heretofore only incidentally referred to.

An examination of the entire record discloses that the parol testimony consisted entirely of the testimony of Robert Albrecht, president of both the Manufacturing Company and the Selling Company, and H. A. Pedersen, a Deputy Collector of Internal Revenue. The testimony of Mr. Albrecht was unequivocal and insofar as it related to this question may be summarized as follows:

The business had for many years prior to 1932 been operated through three departments, the manufacturing department, the wholesale department and the retail department. At the beginning of each season an estimate of the cost of a garment of each style and size to be manufactured in the ensuing season was made by estimating the number and cost of tanned furs necessary, and adding to that the cost of productive labor, factory overheads, and the cost of "findings" which consist of thread, buttons, inner lining, canvass backing, and other small items. The total cost of the foregoing, consisting of skins, labor, lining, findings, and factory overhead equalled what is known as the manufacturer's cost. To that cost was added a manufacturer's profit of 13% of the manufacturer's cost and, (subsequent to the June 20th transaction) the excise tax of 10%, the total of which gave what was termed the manufacturer's selling price. These items were entered in what was known as the "scale book." The witness testified that this practice was followed generally in the fur business as the accepted method of arriving at the price at which the manufacturer sold to the wholesaler. The "scale book" price controlled although the actual cost of each completed garment was tabulated for comparison with the estimated or "scale book" cost. Portions of the scale book, and actual cost figures of a number of garments manufactured in 1932, which were introduced as exhibits, show the actual cost and the scale book cost varying slightly, with the scale book cost universally the greater. The witness testified that the wholesale selling price was entered in the scale book at 50% more than the manufacturer's selling price and was the price at which this company and the fur industry generally sold at wholesale. The retail selling price was also entered in the scale book. That price was usually 20% more than the wholesale selling price. It varied with different retailers, but the witness stated that the retail price for the industry generally, where the wholesaler, like appellant, furnished much of the selling service, was, as stated, 20% more than the wholesale selling price.

The testimony of Mr. Pedersen was devoted almost entirely to an explanation of the method followed in applying the tax to the selling prices as shown by the books

5 See Sec. 619(b) supra, note.

of the Selling and Manufacturing Companies. He pointed out that neither the Manufacturing Company or the Selling Company at any time made any sales to wholesalers. It is undisputed that before the creation of the Selling Company, the Manufacturing Company maintained a wholesale department to which garments were charged at the manufacturer's scale book selling price. It also performed all of the services of a wholesaler and sold to retailers through its wholesale department at the wholesaler's selling price. After the Selling Company was created and subsequent to the fictitious sale of June 20, 1932, the Manufacturing Company sold all of its products to the Selling Company at actual cost plus 13%, plus tax. The actual manufacturing cost plus 13% plus tax was, as heretofore stated, somewhat less than the scale book manufacturer's selling price. Since all of appellant's evidence on that question was to the effect that the scale book manufacturer's selling price was the market price at which manufacturers sold, the trial court's finding that the sales by the Manufacturing Company to the Sales Company subsequent to June 20, 1932, were at prices less than the market price is correct upon appellant's own theory that the scale book price was the market price. The sales made by the Manufacturing Company to the Selling Company subsequent to June 20, 1932, being at less than the market price, paragraph (b) (3) of Section 619, supra, requires that the tax be computed "on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner."

■ Pursuant to this direction the Commissioner fixed the price at which articles such as those manufactured by appellant were sold by the manufacturer or producer in the ordinary course of trade at the wholesaler's selling price which was the price at which the Selling Company sold to retailers. But the record contains no evidence whatever of any market price or price at which articles such as those made by appellant were sold by manufacturers in the ordinary course of business, other than the testimony of Mr. Albrecht that the scale book manufacturers' selling price was the price at which appellant sold and at which such articles were generally sold by manufacturers. The Commissioner's determination and the trial court's finding that the fair market price was, as determined by the Commissioner, the wholesale selling price by the Selling Company to the retailer is unsupported by any evidence in this record. Unless the Commissioner's determination was arbitrary it was the duty of the trial court to uphold it. Ray Consolidated Copper Co. v. United States, 268 U.S. 373, 45 S.Ct. 526, 69 L.Ed. 1003. But the presumption in favor of the propriety of the Commissioner's action takes flight upon the entry of proven facts. Wiget v. Becker, 8 Cir., 84 F.2d 706.

■ The regulations promulgated under authority of the Revenue Act of 1932 do not require the action taken. Those regulations insofar as they may appear to apply are quoted in the margin.[6] They apply to the determination of market price of goods when sold at retail or by the manufacturer to the retailer. They do not contemplate a situation such as that presented here where the record shows a well-established practice in the industry generally of a sale by the manufacturer to a wholesaler at prices customarily followed by the trade.

■ If the inquiry was one to determine the customary selling price between the Manufacturing Company and the retailer (made through the Selling Company) or the generally established market price

---

[6] "Regulation 46, Article 15:—The 'fair market price' within the meaning of the Act and these regulations is the price for which articles are sold by manufacturers at the place of manufacture or production in the ordinary course of trade and in the absence of special arrangements. Where, for any reason, a manufacturer's sale price does not properly reflect the price for which similar articles are sold at the place of manufacture or production in the ordinary course of trade by manufacturers and the sale is not an arm's-length transaction, the tax shall be computed upon a fair market price.

\* \* \* \* \* \*

"Where a manufacturer sells articles at retail, the tax on his retail sales ordinarily will be computed upon a price for which similar articles are sold by him at wholesale. However, in such cases it must be shown that the manufacturer has an established bona fide practice of selling the same articles in substantial quantities at wholesale. If he has no such sales at wholesale, a fair market price will be determined by the Commissioner."

of the garments sold by a wholesaler to retail merchants, the conclusion reached would find support in the record. Or if, as it was held in Bourjois, Inc. v. McGowan, 2 Cir., 85 F.2d 510, the manufacturer's selling price had theretofore been established by the manufacturer at the price obtained from the retailer, the application of the tax to the price so established would be proper. But since the tax is to be applied to the price for which appellant's products and products similar to appellant's, are sold in the ordinary course of trade by manufacturers or producers, and since appellant had not established its manufacturer's selling price at the price obtained from retailers and there is no finding of the price for which appellant would have sold its products as a manufacturer in the ordinary course of trade, this cause must be reversed and remanded for determination of the latter question by the trial court and the application of the tax to the price at which appellant's products would have sold in the usual course of trade by a manufacturer or producer.

The cause is reversed and remanded for further proceedings not inconsistent herewith.