## SAMSON TIRE & RUBBER CORPORATION v. ROGAN.
### No. 10201.

Circuit Court of Appeals, Ninth Circuit.
June 1, 1943

E. S. Williams, of Los Angeles, Cal., for appellant.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Helen R. Carloss, Clarence E. Dawson, and Willard H. Pedrick, Sp. Assts. to Atty. Gen., and Leo V. Silverstein, U. S. Atty., of Los Angeles, Cal., for appellee.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

MATHEWS, Circuit Judge.

Appellee, Nat Rogan, Collector of Internal Revenue for the Sixth Collection District of California, collected of appellant, Samson Tire & Rubber Corporation, as excise taxes on rubber tires and inner tubes manufactured and sold by appellant, $39,940.45 plus interest of $16,215.45—a total of $56,155.90. Its claim for a refund having been denied, appellant brought an action against appellee to recover the $56,155.90 as having been illegally collected. Appellee answered, trial was had, findings of fact and conclusions of law were stated and judgment was entered in favor of appellee. From that judgment this appeal is prosecuted.

The $56,155.90 was collected under color of § 602 of the Revenue Act of 1932, 26 U.S.C.A.Int.Rev.Acts, page 608, which provided:

"There is hereby imposed upon the following articles sold by the manufacturer, producer, or importer, a tax at the following rates:

"(1) Tires wholly or in part of rubber, 2¼ cents a pound on total weight * * *.

"(2) Inner tubes (for tires) wholly or in part of rubber, 4 cents a pound on total weight * * *."

Section 629 of the Act, 26 U.S.C.A.Int. Rev.Acts, page 624, provided: "This title [§§ 601–630] shall take effect on the fifteenth day after the date of the enactment of this Act * * *." The Act was enacted on June 6, 1932. Hence § 602 did not take effect until June 21, 1932.

The $56,155.90 was collected in respect of tires and tubes which, admittedly, were manufactured by appellant before June 21, 1932, and which appellant claimed to have sold to United States Rubber Products, Incorporated, hereafter called Products, in and by the following agreement:

"This agreement made as of the 1st day of June, 1932, between [appellant], herein called the 'Manufacturer,' and [Products], herein called the 'Distributing Company,' witnesseth:

"Whereas, the Manufacturer is engaged in the manufacture of automotive tire casings and tubes[1] at Los Angeles, California, and the Distributing Company desires to purchase the Manufacturer's entire production and output of the same for sale by the Distributing Company to its customers;

"Now, therefore, in consideration of the undertakings and agreements hereinafter set forth, the parties hereto agree as follows:

"1. The Manufacturer hereby sells to the Distributing Company and the Distributing Company hereby purchases from the Manufacturer, upon the terms herein stated, all automotive tire casings and tubes, tire repair materials and accessories thereto which the Manufacturer has on hand and undisposed of on the thirty-first day of May, 1932, all of which merchandise shall become the property of the Distributing Company upon the execution of this agreement. The Manufacturer further will sell to the Distributing Company and the Distributing Company will purchase and accept from the Manufacturer' upon the terms herein set forth, all automotive tire casings and tubes, repair materials and accessories manufactured and/or acquired from day to day by the Manufacturer beginning June 1, 1932, and said merchandise shall be and become the property of the Distributing Company as and when the same shall have been manufactured and/or acquired by the Manufacturer. This agreement, however, shall not apply to or include any merchandise that the Manufacturer shall have specifically sold or contracted to sell to particular customers other than the Distributing Company.

---

[1] All tire casings mentioned in the agreement were tires wholly or in part of rubber, and all tubes mentioned in the agreement were inner tubes (for tires) wholly or in part of rubber.

"3.[2] The price to the Distributing Company for such merchandise shall be the total cost of manufacture or acquisition thereof, plus five per cent. (5%) of such total cost.

"4. The Manufacturer will exert its best efforts to manufacture and produce sufficient of such merchandise to meet the demands of the business of the Distributing Company, and the Distributing Company will promote so far as possible, the sale and distribution of such merchandise.

"5. The merchandise sold hereunder shall be shipped by the Manufacturer to the Distributing Company or upon the Distributing Company's orders as may be directed by the Distributing Company from time to time, with freight to destination prepaid by the Manufacturer.

"6. Adjustment of accounts between the Manufacturer and the Distributing Company shall be made monthly as of the last day of each month, or at more frequent intervals if the Manufacturer shall so require.

"7. True and complete books and records shall be kept by the Manufacturer of its capital and assets pertaining to the manufacture and/or acquisition of merchandise for the purposes of this agreement, and of all operating and other expenses and costs pertaining thereto and incurred by the Manufacturer from time to time, and of all shipments and deliveries made by the Manufacturer hereunder. The Distributing Company shall at all times have free and unrestricted rights to inspect the said books and records.

"8. This agreement shall be and continue in force from June 1, 1932, until terminated by either party giving to the other thirty (30) days' notice in writing in advance of such termination.

"9. This agreement constitutes the only agreement between the Manufacturer and the Distributing Company with respect to the matters covered hereby and cancels and terminates any other agreement, oral or written, between the parties in that connection.

"In witness whereof, the parties hereto have caused these presents to be executed by their respective officers hereunto duly authorized and their corporate seals to be hereunto affixed as of the day and year first above written."

The agreement was executed and acknowledged on behalf of Products on June 13, 1932, and was executed and acknowledged on behalf of appellant on June 15, 1932. The trial court held the agreement invalid and ineffective. Hence the judgment here appealed from.

One purpose of the agreement between appellant and Products was to avoid the imposition of excise taxes on tires and tubes manufactured by appellant before June 21, 1932. That was a legitimate purpose. Section 629 of the Revenue Act of 1932 was obviously intended to permit such avoidance. "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355. See, also, United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 50 S.Ct. 169, 74 L.Ed. 504; Commissioner v. Eldridge, 9 Cir., 79 F.2d 629, 631, 102 A.L.R. 500; Commissioner v. Laughton, 9 Cir., 113 F.2d 103. It is true that, for tax purposes, a transaction which is "unreal or a sham" may be disregarded. Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406. But a real transaction, having an independent business purpose, may not be disregarded, though designed to procure "an advantageous tax consequence." Commissioner v. Laughton, supra [113 F.2d 104].

The court did not find that the agreement between appellant and Products was unreal or a sham, nor did the evidence warrant such a finding. The court found that the agreement served no business purpose, but that finding is clearly erroneous. The evidence shows that the agreement had a business purpose, namely, to sell the merchandise, including tires and tubes, described in the agreement at the price and on the terms specified therein, and that that purpose was accomplished.

Transactions which were unreal or shams were dealt with in Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, supra; Mehrlust v. Higgins, 2 Cir., 112 F.2d 717; Continental Oil Co. v. Jones, 10 Cir., 113 F.2d 557; E. Albrecht & Son v. Landy,

---

[2] This paragraph (numbered 3) was the second paragraph of the agreement. There was no paragraph 2.

348

8 Cir., 114 F.2d 202; and Black, Starr & Frost-Gorhan v. United States, 39 F.Supp. 109, 94 Ct.Cl. 87, cited by appellee. In each of those cases a taxpayer made a purported sale to a corporation of which such taxpayer was the sole stockholder. We are not here dealing with any such sale. Here the buyer (Products) was not a subsidiary of the seller (appellant), but was a subsidiary of United States Rubber Company, hereafter called Rubber. Appellant was not a stockholder of Products, much less its sole stockholder. Nor was appellant a stockholder of Rubber. It did not control either Rubber or Products, and could not have done so.

The court found that Rubber "exercised complete control, by stock ownership and otherwise, of the policies, affairs and transactions of [appellant];" that Rubber "dictated and arranged" the "transfer as of June 1, 1932, between [appellant and Products];" and that, in effecting said transfer, Rubber "utilized" appellant as a mere instrumentality "for the purpose of attempting to avoid an imminent excise tax." These findings are challenged. The evidence establishes without conflict the following facts:

Appellant had outstanding at all pertinent times 165,010 shares of common (voting) stock, 80,000 shares of convertible preferred stock and 5,769 shares of nonconvertible preferred stock.[3] Samson Corporation, hereafter called Samson, owned 160,185 shares of appellant's common stock and 59,929 shares of its convertible preferred stock. Meyer Rubber Company, hereafter called Meyer, owned 310 shares of appellant's common stock and 20,000 shares of its convertible preferred stock. Others owned 4,515 shares of appellant's common stock, 71 shares of its convertible preferred stock and all of its nonconvertible preferred stock. Samson had outstanding 120,000 shares of class A common (voting) stock, 48,055 shares of class B common stock and 160,185 shares of preferred stock.[4] Meyer owned all of Samson's class A common stock, 2,900 shares of its class B common stock and 18,400 shares of its preferred stock. Others owned 45,155

shares of Samson's class B common stock and 141,785 shares of its preferred stock. Rubber owned all of Meyer's stock, but did not own any of Samson's stock or any of appellant's stock.

As Meyer's sole stockholder, Rubber controlled Meyer. Meyer owned a majority of Samson's voting stock and thereby controlled Samson. Samson owned a majority of appellant's voting stock and thereby controlled appellant. Thus, indirectly, Rubber controlled appellant. In exercising such control, Rubber was a fiduciary. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 63 L.Ed. 1099; Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281. Its powers were powers in trust. Pepper v. Litton, supra. It could not lawfully, and presumably did not, exercise its powers in its own interest merely. It was bound to, and presumably did, exercise them in the interest and for the benefit of appellant, which included the benefit to the common shares other than Rubber's and the 141,785 shares of appellant's preferred stock owned by others than Rubber, whose shares had a preference right in the profits of such business, and in any accretion of capital making more certain a full return of capital on partial or final liquidation. There is no evidence that Rubber abused its power or violated its duty with respect to appellant or its stockholder interests. Here was at once a legitimate business purpose and the performance of a trust obligation to third parties.

It is true, but not material, that Rubber directed appellant to make its agreement with Products and did so to enable appellant to avoid the imposition of taxes on the tires and tubes described in the agreement. In giving such direction, Rubber acted in the interest and for the benefit of appellant. The agreement, a lawful and proper one, was not rendered unlawful or improper by the fact that Rubber directed it or, as the court found, "dictated and arranged" it.

It should here be noted that the tires and tubes in question were manufactured and sold by appellant, not Rubber; that excise

[3] Appellant's preferred stock (convertible and nonconvertible) had a par value of $10 a share and, as the court found, "carried 7% cumulative dividends but was not entitled to vote unless a default occurred in dividends for more than two years."

[4] Samson's preferred stock had a par value of $10 a share, but, as the court found, had no "voting rights" unless dividends thereon "should continue consecutively for one year to be at a rate of less than 5% per annum."

taxes thereon, if such had been imposed, would have been payable by appellant, not Rubber; and that appellant, not Rubber, was directly interested in avoiding the imposition of such taxes. These facts compel rejection of the finding that appellant, in making its agreement with Products, was a mere instrumentality of Rubber.

The court found that, beginning January 1, 1931, appellant "was operated in effect and practice as a division of the United States Rubber system," but did not explain what that "system" was. Without such explanation, the finding is meaningless. The court did not find, and could not properly find, that appellant was a "division" or department of Rubber. Appellant and Rubber were separate corporations, each having its own corporate business. They did business with each other, but their business with each other was not their only business. Each had other customers. Much of appellant's business was business in which Rubber had no interest. Much of Rubber's business was business in which appellant had no interest. There was no merger of appellant and Rubber or of their businesses.

■ Appellee makes much of the fact that, prior to June 1, 1932, appellant shipped tires and tubes to Rubber or to designated subsidiaries of Rubber, and that Rubber sold them or caused them to be sold and remitted the proceeds, less specified deductions, to appellant, thus acting as appellant's selling agent. That was pursuant to an agreement between appellant and Rubber dated January 1, 1931. That agreement was terminated by an agreement between appellant and Rubber dated June 1, 1932.[5] Having been so terminated, the agreement between appellant and Rubber dated January 1, 1931, did not preclude or render ineffective the agreement between appellant and Products dated June 1, 1932.

Appellee also stresses the fact that on June 21, 1932, appellant and Products made an agreement whereby appellant agreed to ship tires and tubes to Products, and Products agreed to sell them and remit the proceeds, less specified deductions, to appellant, thus acting as appellant's selling agent. That agreement terminated and canceled "all previous agreements between the parties,"[6] but was not retroactive. It therefore has no relevancy here.

■■ It is immaterial, if true, that the tires and tubes described in the agreement between appellant and Products dated June 1, 1932, were not delivered to Products before June 21, 1932. The agreement was executed, delivered and performed in California, and this case was tried in California. Hence, in determining whether or not the agreement was a sale and when, if at all, it became effective, the applicable law is that of California. Applying that law,[7] we hold that the agreement was a sale, that it became effective before June 21, 1932, and that the date of delivery is unimportant.

Finally, appellee contends that appellant failed to make the proof required by § 621 (d) of the Revenue Act of 1932, 26 U.S. C.A.Int.Rev.Acts, page 621, which provided: "No overpayment of tax under this title [§§ 601-630] shall be credited or refunded * * * unless the person who paid the tax establishes * * * that he has not included the tax in the price of the article with respect to which it was imposed * * *." There is no merit in appellee's contention. The evidence clearly establishes that appellant did not include any excise tax in the price of the tires and tubes sold to Products by the agreement dated June 1, 1932.

■ We conclude that the agreement was valid and effective; that the excise tax imposed by § 602 of the Revenue Act of 1932 was not imposed on or applicable to the tires and tubes described in the agreement; and that the $56,155.90 which appellee collected of appellant was illegally collected and should have been refunded.

Judgment reversed.

---

[5] Thus appellant made two agreements dated June 1, 1932—one with Rubber, one with Products. The two were executed simultaneously.

[6] Including their agreement dated June 1, 1932.

[7] Civil Code of California, §§ 1721, 1723, 1725, 1738, 1739.